*In Re* LUIS M. PAGÁN, querellado.

Núm. 75.—*Sometido:* Julio 6, 1950. *Resuelto:* Julio 26, 1950.

Ángel Roberto Díaz, abogado del querellado; J. Rivera Barreras, Fiscal del Tribunal Supremo y Frank J. Vizcarrondo, Fiscal Auxiliar, abogados de El Pueblo.

PER CURIAM: El 5 de diciembre de 1949 el Fiscal de este Tribunal, por delegación del Procurador General, radicó querella de *disbarment* contra el abogado Luis M. Pagán. En su contestación, el querellado expuso, en adición a otras defensas,(¹) las siguientes: 1. Que el Procurador General no tiene facultades por sí ni por medio del Fiscal de este Tribunal, para instar una querella de *disbarment*. 2. Que en el presente caso no se ha seguido el procedimiento estatuído por la Ley de 11 de marzo de 1909 creando la Comisión de Reputación, y por el contrario se ha seguido un procedimiento no autorizado por ley.

Una vez radicada la contestación, este Tribunal, con fecha 31 de marzo de 1950, nombró *Master* al Lic. Gabriel de la Haba para que oyera y recibiera la prueba de ambas partes y archivara su informe conteniendo sus conclusiones de hecho, lo cual hizo oportunamente habiendo radicado su informe el 17 de mayo de 1950. Posteriormente, el querellado y el Fiscal radicaron sus objeciones al mismo.

Antes de ocuparnos del informe del *Master*, parece oportuno resolver las defensas alegadas por el querellado.

Efectivamente, la Ley de 11 de marzo de 1909 (pág. 97) creando la Comisión de Reputación no concede al Procurador General la facultad de presentar querellas de *disbarment*, pero si el querellado hubiera examinado la Ley

---

(¹) Las otras defensas son tan manifiestamente improcedentes, que no nos detendremos a exponerlas y mucho menos a discutirlas.

núm. 43 de 14 de mayo de 1932 (pág. 525) organizando el Colegio de Abogados, hubiera notado que su sección 2 (*g*) expresamente prescribe:

". . .Nada de lo dispuesto en este apartado se entenderá en el sentido de limitar o alterar la facultad del Procurador General de Puerto Rico para iniciar por su propia cuenta estos procedimientos."

Pero es que, aparte de cualquier disposición que sería meramente directiva para este Tribunal, la remoción, al igual que la admisión al ejercicio de la abogacía, es facultad inherente de la rama judicial y este Tribunal puede, a esos efectos, seguir el procedimiento que estime conveniente, siempre que esté en armonía con el debido procedimiento de ley, y el seguido en este caso claramente lo está.

Resueltas las cuestiones de derecho, procederemos a considerar el informe del *Master*. Literalmente dice así:

"INFORME Y CONCLUSIONES DE HECHO.

"El Fiscal de este Honorable Tribunal radicó una querella contra el Abogado-Notario Luis M. Pagán solicitando fuera suspendido en el ejercicio de la profesión de Abogado y Notario.

"Por resolución de este Honorable Tribunal de fecha 31 de marzo de 1950, el Abogado que suscribe este informe fué designado como 'Master' para oír y recibir toda la prueba y certificarla y remitirla al Tribunal con sus conclusiones de hecho.

"Por resolución de este Honorable Tribunal de fecha 3 de abril de 1950 se señaló como fecha para la vista de los cargos y la práctica de la prueba, el 24 de abril de 1950, a las 9 de la mañana.

"En la fecha y hora señalados comparecieron ante el 'Master', el Honorable Fiscal del Tribunal Supremo para sostener los cargos formulados y el querellado Lic. Luis M. Pagán, personalmente y asistido por abogado.

"Se celebraron vistas públicas los días 24, 25 y 26 de abril de 1950 en sesiones continuas, por la mañana y por la tarde, hasta que ambas partes concluyeron la práctica de su prueba y sometieron el caso para informe del 'Master'.

"Actuó como taquígrafo-repórter el Sr. Durán, taquígrafo del Departamento de Justicia, con la conformidad de las partes.

El Secretario de este Honorable Tribunal administró el juramento a todos los testigos de cargo y de la defensa, todos los cuales declararon bajo juramento.

"Las vistas fueron celebradas durante los tres días mencionados con la asistencia del Sr. Secretario de este Tribunal y del Sr. Márshal.

"Por el Ministerio Fiscal declararon once testigos y por la defensa declararon otros once testigos y el propio querellado Lic. Luis M. Pagán y en la prueba de 'rebuttal' declaró un testigo del Ministerio Fiscal.

"La prueba documental consta de 55 *exhibits* por parte del Ministerio Fiscal y de 8 exhibits por parte de la defensa. De esta prueba documental se admitieron sin objeción 43 exhibits del Ministerio Fiscal y 12 fueron admitidos sujetos a objeción del querellado que constan del récord taquigráfico de la vista. Los 8 exhibits del querellado fueron admitidos sin objeción por parte del Ministerio Fiscal.

"Como consecuencia del testimonio de los testigos de ambas partes y del estudio de la prueba documental admitida y que el 'Master' ha considerado pertinente y material a la controversia, así como por sus observaciones personales de los testigos y de la forma y manera que estos declararon a los interrogatorios de ambas partes el 'Master' considera como hechos probados los que se relacionan en las siguientes

"CONCLUSIONES DE HECHO:

"1. El querellado fué admitido al ejercicio de la profesión de Abogado por el Tribunal Supremo de Puerto Rico en 20 de abril de 1944, y al ejercicio del Notariado en mayo 3 de 1944.

"2. La Home Expansion Company, una corporación dedicada a la construcción de hogares, utilizaba los servicios del querellado como abogado y notario.

"3. Por carta de 26 de junio de 1948, dirigida por Enrique Pagán Viera a la Home Expansion Company (Exhibit 3 del Fiscal) el Sr. Pagán Viera autorizó a la compañía a vender 10 solares de su propiedad en la urbanización Truman de Río Piedras, a razón de $8 el metro cuadrado y convino en pagarle una comisión de 5 por ciento. Con este convenio comenzaron las relaciones entre Home Expansion Co. y Enrique Pagán Viera. Aparentemente, la querella en este caso abarca sólo transacciones relacionadas con siete de los diez solares según

puede verse de los Exhibits 6 al 12, ambos inclusive, admitidos en evidencia como prueba del fiscal.

"4. De la prueba testifical se desprende que Enrique Pagán Viera estuvo conforme en trasmitir a todos los compradores de los solares el título de propiedad sobre los mismos sin recibir el importe de la venta y dando por recibido éste en la escritura de trasmisión, en un entendido con la Home Expansion Co., al efecto de que recibiría una parte sustancial del precio en efectivo tan pronto los compradores negociaran un préstamo hipotecario sobre los solares y la construcción que en ella había de realizar la Home Expansion Co. de algún banco local a través de la agencia federal conocida por Federal Housing Administration que asegura tales préstamos a los bancos que los realizan. El remanente lo había de recibir el Sr. Pagán Viera en el plazo de un año, bien mediante fondos que habían de levantar los compradores de los solares que fueran veteranos, en segunda hipoteca, a través de operaciones con la Veterans Administration que habían de ser gestionadas por la Home Expansion Co. para los adquirentes de los solares.

"5. Esta operación con la Veterans Administration no tuvo éxito y por tanto no pudieron levantarse los fondos con que la Home Expansion Co. se proponía liquidar el remanente al vendedor Sr. Pagán Viera.

"6. Se desprende igualmente de la evidencia documental y testifical que el abogado Luis M. Pagán, querellado en este caso, preparó entonces escrituras de segundas hipotecas a favor de Enrique Pagán Viera y obtuvo las firmas de los compradores de los solares, pero no la del Sr. Pagán Viera, que rehusó firmarlas. Véase Exhibits 23 al 33 ambos inclusive. Se desprende también de la evidencia que el Sr. Pagán Viera rehusó firmar tales escrituras, por no estar de acuerdo con lo convenido por él con la Home Expansion Company, ya que dichas hipotecas eran para pagarse a largo plazo y mediante abonos mensuales que él alegó no era lo convenido sino que el plazo máximo era de un año. La evidencia no revela si este incumplimiento de las condiciones convenidas se debió a algún acto del querellado, o si fué exclusivamente de la responsabilidad de la Home Expansion Co., y de su Presidente Sr. Ward.

"7. Las escrituras de venta de Enrique Pagán Viera a los distintos compradores, Exhibits 6 al 12 ambos inclusive, se llevaron a efecto a fines de noviembre y principios de diciembre de 1948, y con fecha 20 de noviembre de 1948 aparente-

mente la Home Expansion Co. había pagado al Sr. Pagán Viera la cantidad convenida de contado, ya que en esa fecha, según el Exhibit 5, le entregó un pagaré por $8,700 importe del remanente adeudádole cuyo pagaré, entre otras cosas, refiriéndose al pago, dice lo siguiente: 'será pagado por nosotros mediante hipotecas que se constituirán oportunamente'. Estas hipotecas, cuyos documentos redactó el Lic. Luis M. Pagán, son las que se desprende de la evidencia rehusó firmar el Sr. Pagán por no reunir las condiciones de su convenio, al efecto de que el plazo sería de un año.

"8. En el mes de abril de 1949 aún no se habían otorgado hipotecas satisfactorias a favor de Pagán Viera, a pesar de que éste exigía se cumpliera la obligación contraída con él por la Home Expansion Co. y reconocida en el documento de noviembre 20 de 1948, Exhibit 5, y aún se adeudaba a dicho señor la suma de $1,869 de la cantidad pagadera en efectivo, que debió haber recibido para la fecha en que otorgó escrituras de venta a los compradores de los solares en las que reconoció el recibo de la totalidad del precio.

"9. Al insistir el Sr. Pagán Viera que se cumpliera lo que se había convenido, la Home Expansion Co. a través del querellado propuso al Sr. Pagán Viera pagarle la suma de $1,869 y el remanente adeudado en 4 plazos mensuales iguales vencederos en los meses de junio a septiembre de 1949, después de haber quedado reajustada la obligación de $8,700 a $8,390 y rebajada la suma de $500 con la conformidad del Sr. Pagán Viera, quedando por lo tanto el balance adeudado a él por la Home Expansion Company en la suma de $7,890 que representaban los 4 plazos mensuales convenidos. Al efecto, el querellado Luis M. Pagán, actuando en los momentos como abogado, redactó el contrato entre Enrique Pagán Viera y la Home Expansion Company de fecha 29 de abril de 1949, por *affidavit* núm. 1124 que autenticó el querellado en su carácter de notario. En este contrato, el párrafo 3 expone que por el total de $8,390 'se han constituído segundas hipotecas'. Por el párrafo 7 la Home Expansion Co. se comprometió al pago de la cantidad adeudada rebajada a $7,890 en cuatro plazos iguales de $1,972.50 cada uno; y por el párrafo 8 convinieron ambas partes que 'al fiel cumplimiento de esta obligación, la Home Expansion Co. compromete sus bienes presentes y futuros y especialmente las segundas hipotecas que aparecen constituídas en las ventas efectuadas de algunos (sic) de las fincas como sigue:'

"10. Lo cierto es que en el momento de otorgarse el contrato a que se refiere el párrafo anterior no se habían constituído segundas hipotecas sobre ninguno de los solares vendidos por el Sr. Pagán Viera.

"11. Consumado el contrato entre Pagán Viera y la Home Expansion Company de 29 de abril de 1949 (Exhibit 13), el querellado Luis M. Pagán rehizo las últimas 3 ó 4 páginas de cada una de las escrituras de segundas hipotecas que el Sr. Pagán Viera había rehusado firmar, para que los compradores de los solares iniciaran y firmaran las nuevas páginas mediante las cuales las segundas hipotecas se otorgaban a favor de la Home Expansion Co. en vez de a favor de Pagán Viera. Las escrituras preparadas para la firma del Sr. Pagán Viera quedaron como meros proyectos no firmados, y el notario quedó en libertad de adaptarlas para las otras operaciones de segundas hipotecas con la Home Expansion Company. Véanse los Exhibits 23 al 30 ambos inclusive. En lo que respecta a los Exhibits 31, 32 y 33 se admitió por el querellado que en cuanto a éstos también se habían cambiado las últimas páginas para rehacer las hipotecas segundas, directamente a favor de la Home Expansion Company.

"12. Con el consentimiento de Enrique Pagán Viera, éste aceptó ser pagado directamente por la Home Expansion Company en 4 plazos mensuales por el total que se le quedó adeudando en 29 de abril de 1949 montante a $7,890, pero en ese contrato (Exhibit 13) la Home Expansion Company comprometió especialmente las segundas hipotecas, que aunque dice el contrato 'que aparecen constituídas en las ventas efectuadas de algunas de las fincas' lo cierto es que aún no se habían constituído, deduciéndose por lo tanto que la intención de las partes era, que las 7 segundas hipotecas que habían de constituirse, y que finalmente se constituyeron por los deudores directamente a favor de la Home Expansion Company, garantizarían las obligaciones de la Home Expansion Company a favor de Pagán Viera por la suma de $7,890.

"13. El querellado finalmente obtuvo las firmas de los deudores a las segundas hipotecas directamente a favor de la Home Expansion Company durante los meses de mayo y junio de 1949 (Exhibit 14 al 20).

"14. Habiéndose obligado la Home Expansion Co. a comprometer especialmente las segundas hipotecas que aún no habían otorgado los compradores de los solares y de cuyo importe

se adeudaba todavía a Enrique Pagán Viera la suma de $7,890, el querellado actuó negligentemente, ya que dejó al acreedor Enrique Pagán Viera sin garantía, cuando pudo haber otorgado las segundas hipotecas a favor de pagarés hipotecarios a la orden de la Home Expansion Co. que a su vez pudo ésta endosarlos y pignorarlos a favor del Sr. Pagán Viera, o pudo también dicho querellado haber hipotecado el derecho hipotecario de la Home Expansion Co. para garantizar la obligación del Sr. Pagán Viera. En su condición de abogado que preparó y redactó el contrato de 29 de abril de 1949 (Exhibit 13), y en su condición de notario que autenticó tal contrato, y luego redactó y otorgó las escrituras de segundas hipotecas (Exhibits 14 al 20), el querellado demostró desconocimiento de la ley, abandono en el cumplimiento de sus deberes para con los contratantes y ocasionó al Sr. Pagán Viera la pérdida, o posible pérdida, de la suma de $7,890 como consecuencia de la quiebra posterior de la Home Expansion Co.

"15. Como conclusión de menor importancia que se desprende de la evidencia testifical y documental, el 'Master' pudo apreciar y concluir, que cuando se firmaron las escrituras de segundas hipotecas no estaba presente ni el representante de la Home Expansion Company y su esposa ni los testigos instrumentales que aparecen en dichas escrituras y que los otorgantes no conocían a dichos testigos. Igualmente se concluye de la evidencia que era práctica del notario Luis M. Pagán el obtener las firmas de los otorgantes en las escrituras y luego obtener las firmas de testigos que no habían presenciado el acto y que en muchas ocasiones no conocían a los otorgantes.

"16. Se concluye, por el análisis de la evidencia testifical y documental, que después de vencer el primer plazo de $1,972.50 en junio 2 de 1949, procedente del contrato de 29 de abril de 1949 (Exhibit 13), el acreedor Sr. Pagán Viera estuvo gestionando personalmente, y sin éxito, el cobro de esa suma y que cansado de visitar al Lic. Luis M. Pagán puso el asunto en manos del abogado Lic. Octavio Jiménez. El Lic. Jiménez, a quien habló el acreedor Pagán Viera varios días después de junio 2 de 1949, concertó una entrevista en las oficinas de la Home Expansion Company en la que estuvieron presentes el querellado, el Sr. Ward de la Home Expansion Co., el Sr. Pagán Viera y el abogado Sr. Jiménez. De la evidencia no aparece la fecha de esta entrevista, y sí únicamente que se llevó

a efecto un viernes, que debió ser en el mes de junio que fué el mes que venció el primer plazo que se obligó a pagar la Home Expansion Co. al Sr. Pagán Viera. Del resultado de esta entrevista fué que el abogado Sr. Jiménez por primera vez supo que la Home Expansion Co. se había obligado a entregar ciertas hipotecas al Sr. Pagán Viera, ya que cuando éste fué a su oficina sólo le pidió que interviniera en el cobro del primer plazo y de todas las cantidades restantes que le adeudaba la Home Expansion Co. En ese momento se enteró el Lic. Jiménez que tales hipotecas eran a las que se refería el contrato de 29 de abril, (Exhibit 13), informándole entonces el querellado Sr. Pagán, que tales hipotecas se las había cedido Pagán Viera a la Home Expansion Co. El Lic. Jiménez pidió que se volvieran a retroceder a su cliente tales hipotecas y que esta cesión se hiciera rápidamente en vista de la situación económica de la Home Expansion Co. Fué acordado que se cedieran tales hipotecas al Sr. Pagán Viera y se encomendó al Lic. Jiménez la preparación del documento recibiendo éste del querellado Luis M. Pagán las escrituras de segunda hipoteca para preparar la documentación. El Lic. Jiménez preparó inmediatamente la escritura de cesión de hipotecas (Exhibit 22) y un modelo de acuerdo de autorización de la Home Expansion Co. al Sr. Ward para realizar tales cesiones, (Exhibit 21), y quedaron todos citados para firmar las escrituras el martes a las 2 p.m., en cuyo día fué el Lic. Jiménez a la Home Expansion Co., encontrando 'que había habido un colapso económico de la Home Expansion Co.' y por tal razón no pudo ser firmado el documento de cesión de los segundos créditos hipotecarios. Tampoco revela la evidencia a qué martes se refiere el testigo Lic. Jiménez, pero de toda la prueba se desprende igualmente que se refiere a un martes del mes de junio de 1949. La única evidencia relacionada con el llamado colapso económico que provocó la marcha del Sr. Ward, Presidente de la Home Expansion Co. está en el examen redirecto del testigo Adolfo Vilanova, hijo, que declaró que el Sr. Ward se fué el 19 ó 20 de junio de 1949.

"17. Para la misma época en que Enrique Pagán Viera gestionaba el cobro de lo que le adeudaba la Home Expansion Co., y se llegó al convenio sobre traspaso de las segundas hipotecas, la Home Expansion Company adeudaba a la Ferretería Borinquen propiedad de don Adolfo Vilanova cierta cantidad, y el Sr. Ward, Presidente de esa corporación, había solicitado

se aumentara su crédito hasta la suma de $10,000. El Sr. Ward ofreció dar segundas hipotecas en garantía y el querellado Luis M. Pagán fué encargado de preparar los documentos de cesión de créditos que luego llevó al Sr. Vilanova y éste los hizo revisar por su abogado Lic. Hita. Se acordó finalmente que las escrituras de cesión de créditos serían firmadas el viernes día 10 de junio, y en esa fecha el querellado Sr. Pagán llevó ocho escrituras que totalizaban más de $9,000 para la firma del Sr. Vilanova. Las escrituras fueron firmadas en esa fecha por el Sr. Ward y su esposa y por el Sr. Vilanova.

"18. Las escrituras firmadas entre el Sr. Vilanova y la Home Expansion Company por conducto del Sr. Ward son las números 72 al 78 ambas inclusive de fecha 14 de junio de 1949, Exhibits 37 al 43 ambos inclusive. Estas escrituras aunque aparecen firmadas por los otorgantes, por los testigos, selladas en todas sus páginas con el sello del notario y adheridos y cancelados los correspondientes sellos de rentas internas, no aparecen ni firmadas, ni signadas ni rubricadas por el Notario Luis M. Pagán. Después de firmadas estas escrituras el querellado informó al Sr. Vilanova que podía entregar materiales a la Home Expansion Co. hasta el remanente del crédito por $9,720 garantizado con la cesión de las segundas hipotecas y la Ferretería Borinquen procedió a entregar materiales a la Home Expansion Co., entregándole éstos por valor de $4,207.58 el lunes día 13 de junio de 1949. El querellado Sr. Pagán igualmente informó al Sr. Vilanova que prepararía un contrato para su firma en el cual se comprometía Vilanova a devolver las hipotecas al Sr. Ward una vez pagado el crédito, pero tal contrato no fué nunca llevado al Sr. Vilanova para su firma.

"19. Aun cuando las escrituras se firmaron y formalizaron en 10 de junio de 1949 y debieron ser incorporadas al protocolo del Notario Luis M. Pagán en esa misma fecha, aparecen como otorgadas el martes 14 de junio y no firmadas, signadas o rubricadas por el Notario.

"20. A la fecha en que se firmaron las escrituras, e igualmente en la fecha que se fijó en las mismas la fecha de su otorgamiento, el querellado Luis M. Pagán sabía o debía saber que las segundas hipotecas estaban comprometidas o afectas al crédito de Enrique Pagán Viera y al autorizar su cesión a don Adolfo Vilanova y manifestar a éste que ya podía entregar a la Home Expansion Co. el remanente de los materiales hasta

el montante total del crédito se defraudó a este comerciante, y con motivo de la quiebra posterior de la Home Expansion Company, se le ha ocasionado una pérdida no sólo del crédito de que ya había dispuesto la Home Expansion Company montante a $3,552.65 sino de la suma de $4,207.58 que la Ferretería Borinquen entregó en materiales a la Home Expansion Company el lunes día 13 de junio de 1949. Aunque el querellado pretendió excusar su abandono y su negligencia alegando que no quiso tomar la firma de testigos en el momento de otorgarse las escrituras porque sospechaba o no tenía seguridad de que se pudiera otorgar, y que comprobó esto al día siguiente, sábado día 11 de junio cuando se dió cuenta de que las hipotecas estaban comprometidas a don Enrique Pagán Viera, lo cierto es que el mismo querellado declaró que las dejó sobre su mesa y estuvieron allí hasta el martes día 14 en que su Secretaria le dió numeración, fecha de otorgamiento, fijó los sellos de rentas internas y el sello notarial del querellado. El querellado, a pesar de haberse firmado las escrituras el viernes día 10 de junio de 1949 no las informó en su índice notarial del lunes día 13 de junio, y no fué hasta el día 5 de julio de 1949 que dicho notario entregó al Tribunal de Distrito de San Juan su índice Notarial correspondiente a la semana terminada en 19 de junio de 1949 (Exhibit 51 del Fiscal), y según revela la evidencia, por razón de haber sido requerido para ello por el Juez Administrador del Tribunal del Distrito de San Juan. Cuando el querellado radicó su índice, comprensivo de las escrituras números 72 al 78 ambas inclusive, que corresponden a los Exhibits 37 al 43 ambos inclusive, consignó una nota en la relación de cada escritura que dice: 'no firmada, ni signada, ni rubricada por el Notario'. Las actuaciones del querellado Luis M. Pagán en relación con el crédito por materiales a favor de la Home Expansion Company, y la garantía de este crédito mediante cesión de segundas hipotecas al propietario de la Ferretería Borinquen Sr. Adolfo Vilanova, revelan una crasa negligencia por parte del Notario y una grave despreocupación por la protección de los intereses de las partes que confiaron en él, como consecuencia de lo cual el Sr. Vilanova ha sufrido una pérdida en exceso de $9,000.

"Tales son las conclusiones de hecho a que ha llegado el 'Master' después de un examen cuidadoso y meditado de toda la evidencia testifical y documental y consciente de la delicada misión que le encomendara este Honorable Tribunal."

El querellado y el Fiscal presentaron sus objeciones al informe. Las del querellado van dirigidas a impugnar las conclusiones porque en su opinión no están sostenidas por la prueba. Empero las hemos estudiado a la luz de la evidencia presentada y no cabe duda que todas y cada una de las impugnadas por el querellado están ampliamente sostenidas por la prueba.

En cuanto a las objeciones del Fiscal, no nos detendremos a considerarlas porque en la hipótesis de que estuvieran bien fundadas, no alterarían el resultado de este caso.

A nuestro juicio, el informe revela un cuidadoso estudio de la evidencia aportada y tiene la aprobación de este Tribunal. Del informe surge, entre otras cosas, que el querellado tenía conocimiento de que los créditos garantizados con segundas hipotecas a favor de la Home Expansion Co., de acuerdo con lo estipulado por ésta, habrían de ser cedidos por su dueña a favor de Enrique Pagán Viera para garantizar el precio aplazado que se le adeudaba. Ello no obstante, el querellado se prestó a autorizar como notario la cesión de dichos créditos a favor de Adolfo Vilanova, sabiendo que al hacerse esa transacción, la Home Expansion Co. defraudaba a Pagán Viera, pues para aquella fecha la Compañía no era lo suficientemente solvente para pagar o garantizar los créditos de Pagán Viera. Al mismo tiempo, se defraudó a Vilanova, pues éste era acreedor de la Home Expansion Co. por la suma de $3,552.65 y al ofrecer la deudora dichas hipotecas montantes a $8,390, le extendió un crédito hasta $9,720, todo lo cual quedaría garantizado con dichas segundas hipotecas. Pero el querellado no obstante haber redactado las escrituras y tomado todas las firmas necesarias para llevar a cabo la cesión, no las autorizó con su firma y lejos de comunicarlo a Vilanova, le dijo que podía extender el crédito a la Home Expansion Co. hasta la cantidad de $9,720. Confiando Vilanova en las representaciones del querellado y creyendo que las escrituras habían sido autorizadas por el Notario, entregó a la Home Expansion

Co. materiales en cantidad de $4,207.88. Poco después vino el fracaso económico de la Home Expansion Co. siendo defraudados, tanto Pagán Viera como Vilanova, por las actuaciones poco escrupulosas del querellado.

Si bien todas las actuaciones del querellado fueron realizadas en su carácter de Notario, las mismas envuelven tal depravación moral que lo hacen indigno de ejercer la profesión de abogado.

*Procede separarlo del ejercicio de la profesión de abogado.*