COLEGIO DE ABOGADOS DE PUERTO RICO, querellante, *v.* ROBERT E. SCHNEIDER y OTROS, querellados.

*Número:* O-77-431 *Resuelto:* 5 de abril de 1982

542

*Graciany Miranda Marchand, Raúl Serrano Geyls, Luis F. Camacho,* y otros, abogados del querellante; *Robert E. Schneider, pro se,* abogado del querellado Héctor R. Ramos Díaz.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El Colegio de Abogados de Puerto Rico se querelló ante este Tribunal contra noventa y nueve letrados que no habían satisfecho la cuota anual establecida conforme a

ley. Dictamos orden de mostrar causa por la cual los querellados no debían ser separados del ejercicio de la abogacía.

Casi la totalidad de los querellados pagaron las sumas adeudadas. Dos querellados, los licenciados Robert E. Schneider y Héctor Ricardo Ramos Díaz, sostienen que la orden emitida por el Tribunal está reñida con la Constitución del Estado Libre Asociado de Puerto Rico. Solicitaron término, el cual les fue concedido, para sustanciar sus alegaciones.

Los querellados plantearon, en esencia:

(1) que la Asamblea Legislativa carece de poder, por pertenecerle éste exclusivamente al Tribunal Supremo de Puerto Rico, para establecer requisitos para el ejercicio de la abogacía;

(2) que no puede obligárseles a ser miembros del Colegio;

(3) que la disposición sobre cuotas de la Ley Núm. 43 de 14 de mayo de 1932 (4 L.P.R.A. sec. 771 *et seq.*), es nula por infringir los derechos a la libre expresión y asociación; y

(4) que las cantidades recaudadas por concepto de la cuota requerida como condición para ejercer la profesión de abogado, así como las percibidas por razón de la compra obligatoria de sellos notariales y forenses, son impermisiblemente utilizadas para propósitos extraños a los deberes del Colegio.

Nombramos un Comisionado Especial para recibir la prueba que las partes interesasen presentar. El Comisionado rindió informe el 9 de septiembre de 1980. Acompañó una estipulación de las partes sobre las cuestiones envueltas, así como la prueba presentada. Los querellados no señalan específicamente las actividades del Colegio que objetan. Tras la presentación de los alegatos correspondientes, el caso quedó finalmente sometido en marzo de 1981.

Examinemos las numerosas cuestiones que este pleito entraña.

1. *La estructura y reglamentación de la abogacía en Puerto Rico.*

El Colegio de Abogados de Puerto Rico se constituyó el 27 de junio de 1840, conforme al Real Decreto de 5 de mayo de 1838 y la Real Orden de 31 de diciembre de 1839. Todd, *Datos Históricos del Ilustre Colegio de Abogados de Puerto Rico*, Rev. Co. Abo. P.R., Vol. I, Núm. 1, pág. 81 (1935). La colegiación en España se conoció desde mucho antes. El Colegio de Madrid, por ejemplo, se fundó en 1596 y el 23 de noviembre de 1617 se dispuso por auto acordado que ningún abogado podría ejercer su profesión en Madrid si no era miembro del Colegio. Del Toro, *Un Siglo de Vida*, Rev. Co. Abo. P.R., Vol. V, Núm. 1, págs. 20, 21 (1940). La colegiación compulsoria de los abogados de Barcelona es de origen aun más antiguo. Carta del Rey Martín de 22 de abril de 1399, cuyo texto se reproduce en A. García-Gallo, *Manual de Historia del Derecho Español*, 3ra ed. revisada, Madrid, Vol. II, pág. 145 *et seq.*

El Real Decreto de 5 de mayo de 1838, conforme al cual se establecieron el Colegio de Abogados de Puerto Rico y muchos otros en España y sus dominios, requería también la incorporación forzosa al colegio correspondiente de toda persona que interesase ejercer la profesión de abogado en la región concernida. La Junta de Gobierno determinaba la admisión de los solicitantes, sujeto a revisión por tribunal competente. El propio Colegio, mediante junta general, fijaba el presupuesto de gastos para cada año y precisaba la cantidad a satisfacerse por cada colegiado. La Junta de Gobierno poseía igualmente amplios poderes de disciplina, sujeto a revisión judicial. Para el texto del Real Decreto, véase: *Biblioteca de Ultramar*, Madrid, Imp. de Alegría y Charlain, 1844, T. 2, pág. 231 *et seq.*

La colegiación compulsoria existió en Puerto Rico hasta su supresión por el general John R. Brooke durante la

gobernación militar de la Isla por Estados Unidos. *General Orders and Circulars, 1898–1900*, U.S. Department of War, G.O. 20 de 3 de diciembre de 1898. Se estableció en vez la Asociación de Abogados de Puerto Rico, pálida entidad de índole voluntaria que vivió precariamente hasta la creación del actual Colegio de Abogados por la Ley Núm. 43 de 14 de mayo de 1932 (4 L.P.R.A. sec. 771 *et seq.*).

El Colegio constituido por la Ley Núm. 43 fue declarado el sucesor de los dos cuerpos jurídicos que le precedieron. Su establecimiento se condicionó a su aceptación en referéndum por la mayoría de los profesionales con derecho a ejercer la abogacía ante el Tribunal Supremo de Puerto Rico.

La Ley Núm. 43, aceptada en el referéndum dispuesto, le impone al Colegio de Abogados las obligaciones, entre otras, de "cooperar al mejoramiento de la administración de [la] justicia", "evacuar los informes y consultas que el Gobierno le reclame", "defender los derechos e inmunidades de los abogados", y "sostener una saludable y estricta moral profesional entre los asociados". 4 L.P.R.A. sec. 772. Entre sus facultades se hallan las de adoptar, con la aprobación del Tribunal Supremo, los cánones de ética profesional que regirán la conducta de los abogados; instituir procedimientos de desaforo ante esta Corte; crear montepíos, sistemas de seguro y fondos especiales; organizar una fundación "para instrumentar [*sic*] sus programas de servicio a la comunidad y a la profesión"; y "ejercitar las facultades incidentales que fueren necesarias o convenientes a los fines de su creación . . .". 4 L.P.R.A. sec. 773.

El Art. 3 de la Ley, 4 L.P.R.A. sec. 774, dispone que "ninguna persona que no sea miembro del mismo [del Colegio] podrá ejercer la profesión de abogado en el Estado Libre Asociado". El Art. 9 autoriza al Colegio a fijar la cuota anual que deberán pagar sus asociados, la cual deberá aprobarse por una mayoría de los miembros que

asistan a una asamblea general de la institución. 4 L.P.R.A. sec. 780. El Art. 10 provee que "Cualquier miembro que no pague su cuota y que en los demás respectos esté calificado como miembro del Colegio quedará suspendido como tal miembro, pero podrá rehabilitarse mediante el pago de lo que adeude por aquel concepto". 4 L.P.R.A. sec. 781.

Los fondos del Colegio de Abogados se nutren principalmente de la referida cuota anual, del sello forense que todo abogado debe adherir al primer escrito que presente en cualquier procedimiento judicial, 4 L.P.R.A. sec. 783, y del producto de los sellos de impuesto notarial y otros sellos que adopte el Colegio conforme a la ley. Véase la Ley Núm. 115 de 6 de mayo de 1941 (4 L.P.R.A. sec. 785).

 Es inmeritorio el argumento de los querellados de que la Asamblea Legislativa de Puerto Rico carece de poder para ordenar, como hizo en 1932, la integración de nuestro foro. Es cierto, según hemos señalado repetidas veces, que la admisión al ejercicio de la abogacía es función inherente de este Tribunal y que la legislación aprobada sobre esta materia, tal como la Ley Núm. 43, "es puramente directiva, no mandatoria para esta Corte". *In re Bosch*, 65 D.P.R. 248, 251 (1945); *Guerrero v. Tribunal de Apelación de Contribuciones de Puerto Rico*, 60 D.P.R. 241 (1942); *Ex parte Jiménez*, 55 D.P.R. 54 (1939); *In re Rodríguez Torres*, 106 D.P.R. 698, 749–750 (1978) (opinión disidente, por otros motivos, del Juez Antonio Negrón García); Arroyo, *Facultad de la Rama Judicial para Reglamentar la Profesión Legal*, 20 Rev. Jur. U.P.R. 38 (1950). La preeminencia de la acción judicial en este campo, el cual incluye naturalmente la facultad de pasar juicio sobre si debe unificarse o no el foro en una jurisdicción y bajo qué condiciones, no significa que la legislación sobre estos particulares que no conflija con las pautas que este Tribunal establezca sea nula. La Ley Núm. 43, en

cuanto establece la colegiación compulsoria en Puerto Rico, es perfectamente válida.

■ La Ley Núm. 43 cumple legítimos propósitos públicos. Ella revivió una de nuestras más antiguas y preciadas instituciones, de incuestionable valor no sólo para el beneficio del estrecho interés de una clase, sino para el buen funcionamiento de la justicia en el país y el adelanto social de la comunidad. Instituciones como el Colegio de Abogados —y la Asamblea Legislativa ha extendido la afiliación obligatoria a muchos otros grupos— cumplen una función muy especial en nuestra sociedad. A distinción del carácter vigorosamente pluralista de la sociedad norteamericana, la nuestra ha sido tradicional-mente una sociedad de orden monolítico, sin la abundancia de voces independientes que tanto aportan a la salud del modo democrático de vida.

El concepto de la integración del foro en diversas partes de Estados Unidos ha vivido una historia diferente a la nuestra.[1] El concepto se propagó en el siglo veinte, mas desde el 1921 hasta la fecha de presentación de este pleito treinta y dos estados, junto a las Islas Vírgenes y el Distrito de Columbia, han unificado sus foros y exigido la afiliación obligatoria. Reynolds, *Compulsory Bar Dues in Montana: Two (and a Half) Challenges*, 39 Mont. L. Rev. 268, 290 *et seq.* (1978).

La integración se ha realizado por acción legislativa en muchos casos y en otros por regla de la corte estatal de última instancia, bien por poder expresamente conferido o en el ejercicio de su poder inherente. Para ejemplos de esta última modalidad, véanse: *In re Integration of the Bar*, 432 P.2d 887, 888 (1967); *Application of the President of the*

---

[1] La idea se propuso originalmente por Herbert H. Harley, fundador de la Asociación Americana de la Judicatura, quien se apoyó principalmente en la experiencia inglesa y canadiense. Dakota del Norte fue el primer estado en unificar su foro (1921). J. Parness, *Citations and Bibliography on the United Bar in the United States*, American Judicature Society Report, Chicago, 1973.

*Mont. Bar Ass'n,* 518 P.2d 32 (1974); *Petition of Rhode Island Bar Ass'n,* 306 A.2d 199 (1973); *Petition of Tennessèe Bar Ass'n,* 532 S.W.2d 224, 229 (1975); *In re Washington State Bar Ass'n,* 493 P.2d 1237 (1972); Jeffers, *Government of the Legal Profession: an Inherent Power Approach,* 9 St. Mary's L.J. 385 (1978).

■ El poder inherente de los tribunales en este campo es de tal magnitud que, aun ante la existencia de un estatuto que prohibía expresamente la colegiación compulsoria, se ha ejercido el poder judicial para disponer exactamente lo contrario. *In re Integration of State Bar of Oklahoma,* 95 P.2d 113 (1939). Véase: *Petition of Tennessee Bar Ass'n,* supra. Se han anulado también estatutos que ordenaban el ingreso de las cuotas correspondientes a la colegiación en los fondos generales del Estado, sujeto a asignación específica por la Asamblea Legislativa. *Sharood v. Hatfield,* 210 N.W.2d 275 (1973).

No hallamos base alguna para negarle al poder legislativo facultad para revivir el antiguo Colegio de Abogados de Puerto Rico, fundado hace tan largos años.

2. *La constitucionalidad de la colegiación obligatoria.*

Consideraremos en esta sección tan solo el problema escueto de la constitucionalidad de la colegiación compulsoria, sin referencia por el momento al asunto de la relación entre el uso de las aportaciones económicas obligatorias y el derecho a la libre expresión.

■ La colegiación obligatoria de los abogados, bien por acción de los parlamentos o de los tribunales, tiene amplia base constitucional, así como la imposición de cuotas. El poder de razón de estado, en el caso de las asambleas legislativas, y la facultad inherente de los tribunales dentro de nuestro ordenamiento jurídico para velar por la buena marcha de la justicia han ofrecido amplia base para justificar la unificación del foro y la adopción de medidas para el sostenimiento de la institu-

ción resultante. No se nos ha citado, ni hemos hallado en nuestra investigación independiente, decisión alguna que invalide el concepto de la colegiación compulsoria. Por el contrario, abundan los casos en Estados Unidos en que se rechaza la contención efectuada aquí de que no puede obligarse a un abogado a pertenecer a una asociación profesional cuyos fines él no apruebe. Véanse: *In re Scott*, 292 P. 291 (1930); *Kelley* v. *State Bar of Oklahoma*, 298 P. 623 (1931); *Application of the President of the Mont. Bar Ass'n.*, supra. En *Lathrop* v. *Donohue*, 367 U.S. 820 (1961), el Tribunal Supremo de los Estados Unidos sostuvo la constitucionalidad del plan para la unificación del foro de Wisconsin.

Las singulares circunstancias sociopolíticas puertorriqueñas a que nos hemos referido antes apoyan aun con mayor fuerza la constitucionalidad de la Ley Núm. 43. Los intereses públicos en la creación de una sociedad vigorosamente pluralista, en el mejoramiento de la abogacía y en la buena marcha del sistema judicial pesan decididamente más que las inconveniencias personales que pueda acarrear en ciertos casos la colegiación obligatoria. El derecho a la no asociación, derivable del derecho contrario consagrado en la Constitución del Estado Libre Asociado, Art. II, Sec. 6, cede ante los intereses señalados, de naturaleza claramente imperiosa bajo la constitución puertorriqueña. En diversas ocasiones hemos considerado esta legislación y la hemos aceptado como "legislación satisfactoria para ayudar a esta Corte en la reglamentación de admisiones al foro y de la conducta de sus miembros" y hemos resuelto expresamente que "para poder gozar del privilegio que le conferimos a un abogado para ejercer en nuestras cortes . . . debe pertenecer al Colegio . . .". *In re Bosch*, 65 D.P.R. 248, 251-252 (1945). En *Colegio de Abogados de P.R.* v. *Fajardo*, 51 D.P.R. 528 (1937), suspendimos a varios letrados por falta de pago de sus cuotas hasta tanto procediesen a satisfacerlas.

Resolvemos que la Constitución del Estado Libre Asociado, vigente desde 1952, deja incólume el principio recogido en el Art. 3 de la Ley Núm. 43 (4 L.P.R.A. sec. 774), al efecto de que ninguna persona que no sea miembro del Colegio de Abogados de Puerto Rico podrá ejercer la abogacía en esta jurisdicción. La obligación de pagar la cuota correspondiente es igualmente constitucional. *Bosch* y *Fajardo* quedan inalterados en lo que toca al tema particular que nos ocupa en esta sección. Estamos analizando hasta aquí la validez de la colegiación compulsoria y de las obligaciones de satisfacer determinada cuota y cancelar ciertos sellos. Más adelante nos ocuparemos de la cuestión relativa al uso a que se dediquen los fondos recaudados.

Antes de examinar esta distinción conviene que nos expresemos sobre el ámbito constitucional de acción del Colegio de Abogados de Puerto Rico.

3. *El ámbito de acción del Colegio de Abogados.*

Consideramos esta cuestión únicamente a fin de colocar en el marco debido el problema que discutiremos más tarde, referente a la existencia o no del derecho de un colegiado a objetar el uso a que se dediquen los fondos que él personalmente aporta. Existe confusión, según se deriva de los alegatos, sobre qué es lo que puede o no puede hacer el Colegio y sobre la conexión entre este asunto y el derecho a objetar la utilización de fondos para determinado propósito. Debido a la insuficiencia del récord sobre este extremo, nos limitaremos a expresar los principios generales que gobiernan el campo, sin pretender definir la extensión completa del derecho a la libre expresión del Colegio de Abogados de Puerto Rico.

Debe señalarse en primer término que el rol histórico de varios antiguos Colegios que influyeron en el desarrollo de otros en la tradición civilista no fue el de simples gremios absortos en la defensa de sus intereses de clase. Por el contrario, en Francia, cuya experiencia repercutió

en muchos países, el papel del foro fue eminentemente político desde tiempos remotos. El foro participó activamente en los movimientos políticos principales del país, antes y después de la Revolución. Se le suprimió el 17 de agosto de 1789 y cobró nueva vida en 1804. A. Young, *A Historical Sketch of the French Bar*, Edinburgh, 1869. Véanse: G. Massoniés, *La Jurisdiction du Barreau*, París, 1912; J. Gueydan, *Les avocats, les défenseurs et les avoués de l'Union Francaise*, París, 1954. Los colegios españoles fueron suprimidos en diversas ocasiones por gobiernos contrarios a las libertades que éstos profesaban. En las primeras décadas del siglo XIX, cada vez que se restauraba el gobierno absolutista se suprimía generalmente la colegiación compulsoria. *Enciclopedia Jurídica Española*, Barcelona, Ed. Seix, s.f., T. VII, pág. 71.

Bajo nuestro régimen jurídico, es evidente que el Colegio de Abogados de Puerto Rico puede dedicarse a toda actividad autorizada por la Asamblea Legislativa de Puerto Rico o por este Tribunal que esté racionalmente vinculada a los propósitos expresados en la Ley Núm. 43 ó en la orden que este Tribunal emitiese en su día, si así llegara a determinarlo a petición de parte o a iniciativa propia. El Colegio de Abogados, además, goza como entidad jurídica de amplia libertad de expresión bajo las disposiciones del Art. II, Sec. 4 de la Constitución, al menos tan extensa como la permitida en *First National Bank of Boston* v. *Bellotti*, 435 U.S. 765 (1978). El Colegio no tiene que ser en el caso de Puerto Rico una entidad abstraída y recoleta, temerosa del uso de la voz que le otorga el propio objetivo pluralista que se supone que sirva, aunque tal no es su única razón de ser. En *Bellotti* se dijo a la pág. 784:

> No hallamos apoyo, por tanto, en la Primera o Decimocuarta Enmienda o en las sentencias de este Tribunal para el principio que expresiones de otro modo amparadas por la Primera Enmienda pierden tal protección por el simple

hecho que su fuente es una corporación que no puede probar a satisfacción de una corte, un efecto significativo sobre su negocio o propiedad.

La libertad de expresión del Colegio de Abogados, en representación de la mayoría de sus miembros, no puede coartarse por colegiados disidentes. Véase: *Buckley* v. *Valeo*, 424 U.S. 1 (1976). Éstos gozan de su propia libertad de expresión. El nexo entre la libertad de expresión de estos últimos y el modo de utilizar ciertos fondos del Colegio constituye un problema separado. Nos dirijimos a él en la sección que sigue.

4. *El uso por el Colegio de Abogados de aportaciones obligatorias.*

La primera cuestión a determinar sobre este extremo es si el récord de este caso plantea adecuadamente el problema constitucional de la relación entre el derecho a expresión de un colegiado disidente y el empleo de sus aportaciones para fines que él no aprueba.

El récord no revela las actividades específicas que los querellados objetan, ni la parte de sus aportaciones que se dedican a ellas. Consideramos, no obstante, que estas deficiencias no nos relevan de enfrentarnos al problema constitucional.

Tal ha sido la conclusión a que ha llegado el Tribunal Supremo de Estados Unidos en situaciones similares. En *Lathrop* v. *Donohue*, supra, donde se trató el asunto específico de la colegiación obligatoria de los abogados y la imposición de cuotas para el sostenimiento de la institución resultante, cinco jueces estimaron, a pesar del parco récord ante ellos, que no debía rehuirse el problema constitucional, aunque diferían entre sí en cuanto a su solución. Véase al efecto la referencia a *Lathrop* en *Abood* v. *Detroit Board of Education*, 431 U.S. 209, 233 (1977). Véanse también: *International Association of Machinists* v. *Street*, 367 U.S. 740 (1961); *Brotherhood of Railway and Steamship Clerks* v. *Allen*, 373 U.S. 113 (1963); *Railway Employers' Dept.* v.

*Hanson*, 351 U.S. 225 (1956). En *Allen* se estimó suficiente la siguiente alegación general:

> Sumas recolectadas bajo el convenio han sido y serán utilizadas continua y regularmente por las uniones querelladas para financiar actividades políticas directamente contrarias al libre arbitrio y voluntad de los demandantes. Pág. 118.

Las alegaciones de los colegiados disidentes en este caso son suficientes para plantear el problema constitucional.

Se nos ha citado a *Lathrop* como autoridad para la propuesta regla de que la libertad de expresión de una persona disidente no afecta en modo alguno la utilización por el Colegio de Abogados de los fondos aportados por ella. *Lathrop* constituye autoridad para la constitucionalidad de la colegiación compulsoria, pero la pluralidad de jueces que suscribió la opinión del Tribunal rehusó expresarse sobre la cuestión constitucional que nos ocupa referente a la libertad de expresión. 367 U.S. 830, 845. Esta interpretación de *Lathrop* se confirma en *Abood*, supra, pág. 848.

En *Abood*, no obstante, el Tribunal Supremo de Estados Unidos abordó directamente el problema que nos ocupa. Los apelantes en tal caso eran empleados gubernamentales que objetaban el pago de cuotas a una unión a la que tenían que contribuir bajo una cláusula de taller agencial, aunque objetaban la negociación colectiva en el sector público y el uso por la Unión de sumas sustanciales para apoyar causas políticas. El Tribunal en *Abood* resolvió que la referida cláusula del convenio no violaba la libertad de expresión garantizada por las Enmiendas Primera y Decimocuarta, ni el derecho de asociación, mientras las cuotas se dedicasen a fines obreros. Si los fondos se utilizasen para fines políticos o de otra naturaleza ideológica el Tribunal determinó que la Unión tenía derecho a hacerlo, pero que no podía constitucionalmente emplear los fondos aportados por aquellos que objetasen tales usos.

La norma en *Abood* no es limitable a la situación laboral que tuvo el Tribunal ante sí. La norma es de índole más amplia y afecta la propia definición del ámbito de la Enmienda Primera a la Constitución de Estados Unidos. L. Tribe, *Constitutional Law*, The Foundation Press, Inc., 1978, págs. 589-590, 899. Aunque el Tribunal Supremo de Estados Unidos no se ha expresado directamente sobre el particular, varios comentaristas han señalado la conexión entre *Abood* y el uso para determinados fines de aportaciones obligatorias de miembros disidentes de foros integrados. Parker, *First Amendment Proscriptions on the Integrated Bar: Lathrop v. Donohue Re-Examined*, 22 Ariz. L. Rev. 939 (1980); Reynolds, *Compulsory Bar Dues in Montana: Two (and a Half) Challenges*, supra; Kamenshina, *The First Amendment's Implied Political Establishment Clause*, 67 Cal. L. Rev. 1104 (1979).

*Abood* significa que la libertad de contribuir a causas políticas entraña la libertad de no contribuir. Cuando transponemos la frontera de las actividades más íntimamente relacionadas con la abogacía y la administración de la justicia nos adentramos en una zona de la libertad de conciencia donde el peso de los intereses envueltos cambia decisivamente. Resolvemos en consecuencia que la cláusula sobre libertad de expresión del Art. II, Sec. 4 de la Constitución de Puerto Rico no tiene un sentido más estrecho que el impartido a la Primera Enmienda en este contexto por el Tribunal Supremo de Estados Unidos. La colegiación compulsoria es constitucional. La exigencia de aportaciones obligatorias, establecidas por la mayoría de los colegiados, como condición para ejercer la abogacía en Puerto Rico es constitucional también. El Colegio de Abogados puede constitucionalmente, además, expresarse sobre asuntos ideológicos. Los letrados que disientan sobre tales expresiones, aunque no los que se opongan a la realización por el Colegio de los fines que la ley expresa o que este Tribunal señale, gozan

por otra parte, bajo la Constitución de Puerto Rico del derecho a objetar el uso de sus aportaciones o de porción de ellas para las actividades ideológicas que desaprueben. Tal desaprobación puede ser de índole general, según se expresó en *Allen* y *Abood*.

El reconocimiento del derecho de expresión de un colegiado disidente no resuelve de por sí la controversia aquí planteada. Aún falta confeccionar el remedio apropiado dentro de las circunstancias envueltas para hacer valer tal derecho.

5. *El remedio.*

*Street, Allen* y *Abood* expresan algunas guías generales para diseñar el remedio debido, mas no se manifiestan en modo definitivo sobre este espinoso problema.

El estado del récord en este caso, el cual permite la discusión efectuada de los problemas constitucionales que hemos examinado, pero dificulta el moldeamiento del remedio, nos inclina a fijar un procedimiento que facilite a la par que promueva, dentro de ciertos parámetros, la forjación de un criterio por el propio Colegio de Abogados, como ocurrió en *Abood* a iniciativa de la propia unión concernida. A tal efecto dispondríamos:

> a) No más tarde de la fecha reglamentaria para cobrar la próxima cuota anual, el Colegio de Abogados, tras oportunidad de expresión a su matrícula, diseñará un método para asegurar que las aportaciones de un colegiado disidente no se utilizarán para fines ideológicos.

> b) El método exigirá que toda objeción de tal naturaleza se exprese afirmativamente en la fecha de pago de la cuota. La ausencia oportuna de objeción se entenderá como autorización al Colegio para utilizar las aportaciones para ese año del Colegio conforme a su presupuesto general.

c) El método atenderá debidamente los principios sentados en *Street, Allen* y *Abood.*

d) El método incluirá la selección por la matrícula de una Junta compuesta de abogados de reconocido prestigio que, entre otras funciones que puedan asignársele, pase juicio, sujeto a revisión potestativa por este Tribunal, sobre la clasificación de las actividades del Colegio, la proporción entre las ordinarias y las de índole ideológica, la validez de las objeciones que algún colegiado pueda hacer a determinadas actividades y sobre toda otra controversia que surja sobre el remedio a disponerse y su aplicación.

e) El método deberá intentar lograr el debido equilibrio entre el derecho a la libre expresión de los miembros disidentes y la necesidad, de orden tan fundamental en Puerto Rico, de mantener un Colegio de Abogados vigoroso, fiel a su tradición y funciones históricas y económicamente saludable.

f) El método no permitirá que se viole por ningún asociado el Art. 10 de la Ley Núm. 43 (4 L.P.R.A. sec. 781), u otras disposiciones de ley referentes a la organización y funcionamiento del Colegio de Abogados. Todo colegiado, disienta o no legítimamente del uso de sus aportaciones o parte de ellas para propósitos ideológicos, deberá efectuar en las fechas requeridas las aportaciones que la ley exige o que este Tribunal pueda autorizar en su día. Tal pago no afectará en modo alguno su derecho al remedio a establecerse conforme esta opinión.

g) Hasta tanto se estructura el remedio a que hemos hecho referencia, los querellados deberán satisfacer las sumas que adeuden al Colegio dentro de quince días a partir de la notificación de esta opinión. De no hacerlo quedarán suspendidos del ejercicio de la abogacía en Puerto Rico desde la fecha de expiración de tal término hasta el momento en que satisfagan las referidas deudas.

h) En atención, de otra parte, al derecho de expresión de los querellados, el Colegio de Abogados deberá, hasta tanto se estructure el remedio, depositar en una cuenta separada una cantidad equivalente a la proporción que exista entre las sumas destinadas a fines ideológicos, según se estime temporalmente el término por su Junta de Gobierno, y los gastos totales del Colegio. A esa suma se añadirá otra igual, proveniente de las aportaciones efectuadas conforme a ley por miembros que no hayan disentido, y la cantidad depositada resultante se utilizará exclusivamente para los fines ordinarios del Colegio. Se evitará así que se exija a los querellados contribuir desproporcionadamente a los gastos ordinarios del Colegio.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García emitió opinión concurrente.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

Superados los debates, más o menos pausados o acalorados, que el asunto *bona fide* pueda suscitar, en estricta juridicidad científica hemos de reconocer la constitucionalidad de la colegiación compulsoria. Proponemos y sostenemos la visión de que la unidad institucional de abogados es un presupuesto legítimo para el ejercicio de la actividad forense *imperativo, consustancial* e *inmerso* en el axioma rector consagrado en el Art. V de nuestra Ley Fundamental que crea "un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración". Sec. 2. Aunque ciertamente el legajo de la Asamblea Constituyente guarda silencio al respecto, el mismo refleja que todo el extenso debate en torno al Poder Judicial fue motivado y estimulado por el ideal de lograr una eficiente

administración de la justicia. *Diario de Sesiones*, Tomo 4, págs. 2608-2614 (1961). Más aún, el Colegio de Abogados fue una de las organizaciones que más contribuyó, institucionalmente y a través de sus miembros, en la discusión, análisis y redacción de nuestra Constitución.

No se precisa, pues, mucha elucidación para comprender que la asociación compelida y la reglamentación de la profesión de abogados está inexorablemente atada a esa eficaz gestión *pro* la justicia. No es posible entonces divorciar una de la otra; *el sistema judicial integrado* es la médula de la dinámica operacional constitucional y también va de la mano con el *régimen unificado de colegiación compulsoria.* Forma parte y es congruente con ese mandato y diseño parlamentario de mayor trascendencia que necesariamente ha de ceder al concepto, también importante, de una libertad *incondicionada* de asociación.

La unicidad de la profesión jurídica es el medio garantizador de hacer viables los mejores postulados éticos. Está cimentada en el poder de policía del Estado de exigir el colegiado a quienes interesan y desean ejercer una profesión. Ante la evolución del pensamiento contemporáneo no se discute ya la necesidad de que la admisión a la abogacía —al igual que a otras profesiones y ocupaciones— conlleva determinada educación, preparación, requisitos académicos y condiciones intelectuales y morales. ¿Cómo, entonces, objetar la obligación de colegiarse cuando el Poder Legislativo o Judicial así lo disponen en aras del interés público y como medio para lograr continuidad en esos atributos?

A base del diseño constitucional expuesto suscribimos la opinión del Tribunal, que sostiene la validez de la colegiación obligatoria dispuesta por la Asamblea Legislativa en la Ley Núm. 43 de 14 de mayo de 1932 (4 L.P.R.A. sec. 771 *et seq.*) —en función eminentemente auxiliadora al poder inherente de este Tribunal— ". . . para reglamentar en sus distintos aspectos la profesión de abogado. Innumerables

decisiones antes y después de la aprobación de la Constitución, sostienen ampliamente que '. . . la remoción, al igual que la admisión al ejercicio de la abogacía, es facultad inherente de la rama judicial. . . .' *In re Liceaga*, 82 D.P.R. 252, 255 (1961); *In re Andréu Ribas*, 81 D.P.R. 90, 121 (1959); *In re Pagán*, 71 D.P.R. 761, 763 (1950); *In re Abella*, 67 D.P.R. 229, 238 (1947); *In re González Blanes*, 65 D.P.R. 381, 390–391 (1945); *In re Bosch*, 65 D.P.R. 248, 251 (1945); *In re Arroyo Rivera*, 63 D.P.R. 796, 798 (1944); *Guerrero* v. *Tribunal de Apelación*, 60 D.P.R. 241, 247–252 (1942); *Ex parte Jiménez*, 55 D.P.R. 54 (1939); *In re Tormes*, 30 D.P.R. 267, 268 (1922). La razón fundamental para esta doctrina quedó claramente expuesta en *In re Díaz*, 16 D.P.R. 82, 92 (1910): '[l]a misión de los abogados en la sociedad es altamente noble, pues están llamados a auxiliar a la recta administración de justicia. En ellos confían, no sólo las partes interesadas en los pleitos, sino las cortes mismas'. Recientemente reiteramos que '[s]u misión como tal no se limita meramente a representar intereses privados —en este caso los suyos— sino a ser un instrumento leal y eficaz de la administración de la justicia y del orden en nuestra sociedad.' *Martínez Rivera* v. *Sears, Roebuck*, 98 D.P.R. 641, 652 (1970)". (Escolio omitido.) *In re Rodríguez Torres*, 106 D.P.R. 698, 748–749 (1978) —opinión disidente.

Como toda institución humana el Colegio de Abogados no es infalible. Las fallas del pasado o recientes en que haya podido incurrir, el desagrado de algunos de sus miembros a sus pronunciamientos públicos, no justifican su eliminación en una sociedad pluralista como la nuestra. Existen remedios suficientes y alternos para conjurar los excesos. Las guías adoptadas hoy por este foro forman parte de las distintas avenidas mínimas a seguirse en busca de ese derrotero y en protección de los criterios y aportaciones económicas de sus miembros disidentes, sean una mayoría o una minoría. Debe entenderse que las pequeñas rivalidades o pasiones políticas que se suscitan

en una entidad de este género, el rechazo a los grupos que, a veces, con o sin razón se proclaman y autodenominan portavoces de toda la matrícula, son simplemente los riesgos inherentes y naturales en la dinámica de toda agrupación abierta a cualquier posición o crítica. No son razones de peso suficientes para la destrucción de una institución de hondo arraigo en la sociedad puertorriqueña, que históricamente se ha distinguido como foro abierto de libertad y en la protección de innumerables causas meritorias.

Tampoco son razones para auspiciar y permitir su desaparición mediante el advenimiento inevitable de asociaciones *voluntarias*, aglutinadas —no por el lema "Honrando la Toga"— sino a base de las distintas ideologías del repertorio político-partidista del país. Ello crearía serias dificultades y operaría en detrimento de las funciones de supervisión y fiscalización de este Tribunal, amén de causar una incisión más profunda en nuestra polarizada sociedad. La búsqueda de la verdad y soluciones se troncha cuando se cierran los cauces de discusión.

> No debemos olvidar que en el libre intercambio de ideas se apoya todo sistema democrático de gobierno. La historia alecciona que allí donde se cercena este derecho ha mediado previamente una crisis de sentido común.

> "¿Qué debe entenderse por crisis? 'La crisis es un peculiar cambio histórico', nos dijo Ortega. Es un cambio que consiste 'en que el mundo en que se vivía se ha venido abajo: el hombre queda sin sus convicciones anteriores; sin mundo. Es un cambio que comienza por ser negativo —crítico—. No se sabe, qué pensar de nuevo —sólo se sabe, o se cree saber que las ideas tradicionales son falsas, inadmisibles—. Se siente profundo desprecio por todo o casi todo lo que se creía ayer; pero la verdad es que no se tienen aún nuevas creencias positivas con qué sustituir las tradicionales. Como aquel sistema de convicciones o mundo era el plano que permitía al hombre andar con cierta seguridad entre las cosas y ahora carece de plano, el hombre se vuelve a sentir perdido, azorado, sin orientación'. En las épocas críticas, el hombre

'vive entre dos creencias, sin sentirse instalado en ninguna'. Heras, [Curso de Derecho Constitucional, 1957], pág. 177."

La libertad es como el agua: advertimos su necesidad cuando nos falta, pero en exceso nos ahoga. Sólo la moderación conforta el espíritu y aprovecha al cuerpo. *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84, 113 (1980), (opinión concurrente).

Ese llamado al sentido común, a la moderación, a la tolerancia y al respeto mutuo de quienes integran el foro togado, y en particular aquellos que participan con dedicación en sus asuntos internos —como ejemplo que debe irradiar y extenderse a toda nuestra sociedad— es el reto actual de las presentes y futuras generaciones de abogados. A medida que sigan incrementando los diplomados en leyes, mayor será ese reto y la necesidad de la matriculación obligatoria ante el Colegio de Abogados como denominador común, y medio para desempeñarse en tan noble profesión, al igual que para poder descargar eficientemente este Tribunal su facultad disciplinaria por violaciones a la ética y administrar el sistema judicial unificado.

Voto de inhibición del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 16 de julio de 1982

En el día de hoy, por primera vez, el magistrado que suscribe adviene en conocimiento[1] de que en los volumi-

---

[1] En virtud de haber sido emplazado durante horas de la mañana como miembro de este Tribunal demandado en una acción de sentencia declaratoria, *injunction* y daños radicada el 11 de junio de 1982 en la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico en el caso Núm. 82-1459 promovido por Robert E. Schneider, Jr. y Héctor R. Ramos Díaz. En la misma, a la pág. 19, acápite 48(u) se expone: "Que todos los Jueces son miembros activos del Colegio, y por información y creencia, una mayoría de los Jueces, en algún momento, ha actuado en la Junta de Gobierno del Colegio, o de otro modo ha participado en sus asuntos y actividades. El Juez Asociado Antonio S. Negrón García, quien escribió una opinión separada en que concurre con la decisión del Tribunal Supremo, *es hermano de Arturo Negrón García, quien aparece en la lista del alegato del Colegio como uno de sus abogados* y es candidato a la presidencia del Colegio." (Énfasis y traducción nuestros.)

nosos autos del caso de epígrafe —iniciado el 21 de noviembre de 1977 mediante petición suscrita por su entonces presidente, Lic. Graciany Miranda Marchand, y que al día de hoy consta de dos (2) piezas de más de quinientas (500) páginas y anejos, en las cuales numerosos (treinta y siete (37)) abogados suscriben en distintas fechas diversos escritos— entre la lista de quince (15) abogados adicionales que aparecen al final en uno de los memorandos del querellante Colegio de Abogados de Puerto Rico, figura mecanografiado el nombre de su hermano, Arturo Negrón García. Únicamente en ese documento suscrito por los Lics. Graciany Miranda Marchand y Raúl Serrano Geyls, de modo aislado, plural e incidental es que se menciona su nombre. De ello no nos habíamos percatado.

Por no estar conscientes antes de ese detalle, como por tampoco tener previamente en ninguna de sus etapas o en algún momento el beneficio de una indicación expresa y oportuna de las partes u otra persona, participamos en la decisión en sus méritos y suscribimos separadamente una opinión concurrente a la opinión unánime del Tribunal en que sostuvimos la constitucionalidad de la ley sobre colegiación compulsoria. Además, intervinimos en los trámites posteriores de ejecución parcial.

Independientemente de nuestro firme y reiterado criterio constitucional al respecto, fundado en estricta y reflexiva juridicidad de consciencia —que rechaza toda noción, idea o situación ajena que no sea la de realizar ecuánime y objetivamente cumplida justicia y la cual supera nuestra condición de colegiado o cualquier vínculo familiar— siempre ha sido norma inalterada inhibirnos *sua sponte* cuando surge y conocemos de cualquier circunstancia que lo amerite o alguno de los protagonistas envueltos, directa o indirectamente, así lo justifica. *Santiago* v. *Superintendente de la Policía*, 112 D.P.R. 205 (1982), voto de inhibición; Resoluciones de 15 de junio de 1982, casos O-82-358 y O-82-367, *E.L.A.* v. *Pueblo International,*

*etc.* Fieles a ese espíritu, en aras de la pureza de los procedimientos y al amparo de una estricta interpretación de los Cánones de Ética Judicial, mediante la presente nos inhibimos de participar en la consideración de ulteriores incidentes en este caso.

La Secretaria General certificará y notificará inmediatamente la presente a los abogados de las partes y al Colegio de Abogados para su oportuna publicación.