*471 Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Este caso planteó un asunto novel en nuestra jurisdicción, a saber: si el derecho a la libertad de expresión en su modalidad de expresión compelida, vicia de nulidad el esquema establecido por la Ley Núm. 95 de 29 de noviembre de 1992, conocida como Ley para Crear la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res, que imponía una aportación por concepto de importación de carne de res para, entre otras cosas, promocionar la industria de la carne en Puerto Rico. O, si por el contrario, la campaña publicitaria genérica constituía expresión gubernamental legítima inmune a un ataque bajo la cláusula de libertad de expresión.
Lamentablemente, por estar igualmente dividido este Tribunal se hizo imposible resolver de forma definitiva esta controversia y una sentencia patentemente errónea se convierte en la ley del caso.
I
En septiembre de 2000, el Estado Libre Asociado de Puerto Rico (Estado), a través del Secretario de Hacienda, presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda en cobro de una deuda morosa contraída por Supermercados Amigo, Inc. (peticionario o Amigo). En la misma, el Estado solicitó que se le ordenara a Amigo satisfacer la cantidad de $81,098.54, además de las costas, gastos, intereses y honorarios de abogado. La deuda morosa correspondía a una aportación de un centavo por cada libra de carne de res importada a la isla, que imponía la Ley Núm. 95 de 29 de noviembre de 1992 (Ley Núm. 95). El dinero recaudado ingresaba en un fondo especial: Fondo para el Fomento de la Industria de la *472 Carne de Res (Fondo). Esta ley estuvo vigente desde el 29 de enero de 1993 hasta el 31 de diciembre de 1996, cuando fue derogada parcialmente por la Ley Núm. 238 de 18 de septiembre de 1996 (5 L.RR.A. sees. 3051-3061).
Amigo contestó la demanda instada y reconvino. Señaló que la Ley Núm. 95 era inconstitucional, toda vez que le obligaba a subsidiar un mensaje a favor de la industria de la carne de res del país en detrimento y contrario a sus propios intereses como importador de carne de res. Ello así, ya que los fondos recolectados se utilizaron para pro-pulsar una campaña genérica a favor de la industria de la carne de res del país. Adujo que ello violaba su derecho a la libre expresión, además de ser un mecanismo de carácter proteccionista contrario a la cláusula de comercio interestatal de la Constitución de Estados Unidos. Finalmente indicó que, habida cuenta que la Ley Núm. 238 había derogado la Ley Núm. 95, Amigo no estaba obligado a pagar la contribución que impuso esta última.
Eventualmente, Amigo presentó una moción de sentencia sumaria donde se reiteró en los argumentos antes esbozados. Para sostener su posición respecto a la utilización del dinero recaudado, éste acompañó su moción con copia del estado de situación del Fondo al 30 de noviembre de 1995, copia de varios anuncios publicados por el Fondo en la prensa del país, el texto de varias pautas radiales, el plan estratégico de la agencia de publicidad del Fondo respecto la campaña a desarrollar, y un informe del Fondo provisto por el Departamento de Hacienda. Apéndice de la Petición de certiorari, págs. 110-154.
De dichos documentos se colige que para finales de 1995, cuando cesó la vigencia la Ley Núm. 95, el Fondo había cobrado un total de $650,159.04.(1) De esta cantidad, *473 el Departamento de Hacienda retuvo $65,018.90 en concepto de gastos de administración. Del sobrante se habían utilizado $103,054.34 en gastos de publicidad y $3,787.41 en servicios profesionales. A esa fecha, las cuentas por pa-gar eran: $65,018.90 al Departamento de Hacienda, $3,808.76 por servicios profesionales, $130,193.99 en gastos de publicidad, y $75 en gastos misceláneos. Apéndice de la Petición de certiorari, págs. 110-111. El costo total de la campaña de publicidad fue de doscientos ochenta mil dólares.
A base de esta información, Amigo concluyó que la inmensa mayoría de los fondos recobrados se utilizaron para sufragar los gastos de una campaña de publicidad genérica. Sobre ésta, Amigo indicó que iba dirigida a resaltar la industria de la carne de res del país en perjuicio de la carne importada. Para ello acompañó su moción, como indicamos, con varios anuncios publicados en la prensa, así como pautas radiales, de los que se desprende que la campaña de promoción iba dirigida a fomentar el consumo de la carne de res del país. Véase discusión infra. Los anuncios no identificaban al gobierno del Estado Libre Asociado como el auspiciador de los mismos.
Posteriormente, el Estado presentó su oposición. En su escrito, adujo que eran varios los propósitos que adelantaba la Ley Núm. 95, a saber: reglamentar y promover la industria de carne de res en Puerto Rico, incluso la importada; promover el bienestar general de la industria, y pro-mover una mejor nutrición para la población. Apuntó, además, que dicha ley era una legislación de carácter socioeconómico que constituía un ejercicio legislativo válido del poder de reglamentación del Estado. A su vez, señaló que el producto de las aportaciones recaudadas por la Ley Núm. 95 no se había utilizado exclusivamente para una campaña publicitaria genérica como alegaba Amigo. Finalmente, indicó que la Ley Núm. 238 sólo derogó aquellas disposiciones conflictivas con la Ley Núm. 95, por lo *474 que persistía la obligación de pagar la aportación adeudada.
Para refutar la alegación de Amigo sobre el uso brindado a las aportaciones recibidas mediante la Ley Núm. 95, el Estado acompañó su escrito con extractos de una deposición que se le tomó al Administrador de la Oficina para la Reglamentación de la Industria de la Carne de Res (Administrador) en otro litigio donde se planteaba, según indicó el Estado, idéntica controversia. En ésta, el Administrador testificó que los fondos recibidos se utilizaban para ofrecer orientaciones a consumidores, agricultores e importadores sobre la industria de la carne. Además, que la Oficina para la Reglamentación de la Industria de la Carne de Res —en coordinación con el Fondo— proveía inspectores, quienes corroboraban que los supermercados, las plantas de elaboración y los almacenes cumplieran a cabalidad con la reglamentación aplicable a esta industria, adelantando así los objetivos de la Ley Núm. 95. Apéndice de la Petición de certiorari, págs. 175-181. La moción presentada por el Estado no vino acompañada por copia alguna de los anuncios publicados como parte de la campaña genérica de publicidad de la industria de la carne.
Luego de varios trámites procesales, el Tribunal de Primera Instancia emitió una sentencia mediante la cual rechazó la petición de Amigo. El foro primario concluyó que no era necesario dilucidar los planteamientos de carácter constitucional esgrimidos por Amigo, ya que sólo tenía que resolver si procedía o no el cobro de dinero solicitado. Determinó, entonces, que la derogación parcial de la Ley Núm. 95 no había relevado a Amigo del cumplimiento con la obligación contraída durante la vigencia de ésta, que la deuda existente era líquida y exigible, por lo que “n[a]da impide que se ordene el cobro de dinero adeudado a todo aquel importador que no cumplió con su obligación durante la vigencia de la Ley 95”. Apéndice de la Petición de certiorari, pág. 249.
*475 Insatisfecho, Amigo acudió ante el Tribunal de Apelaciones. El Estado compareció y anejó a su alegato la deposición completa que le fuera tomada al Administrador. El foro apelativo intermedio emitió una sentencia en la que se confirmó el dictamen del foro primario. Concluyó que la Ley Núm. 95 no era inconstitucional de su faz y que, entre otras cosas, la ley no tuvo como propósito exclusivo propiciar una campaña genérica de publicidad. El foro apelado aparentó haber llegado a esa conclusión a base de las ex-presiones del Administrador, según constan en su deposición. Indicó que la Ley Núm. 95 servía un fin legítimo del Estado, por lo que constituía expresión gubernamental válida.
Además, señaló que la ley no imponía una carga irrazonable sobre el derecho a la libre expresión de Amigo, habida cuenta de que sólo el diez por ciento de las aportaciones que debían ingresar al Fondo habían sido destinadas para la campaña de promoción objetada, y que la ley no restringía la capacidad de Amigo de llevar a cabo su propia propaganda o promoción. Finalmente, concluyó que la controversia ante el foro primario era una estrictamente de derecho, por lo que procedía resolverla a través del mecanismo de sentencia sumaria.
En desacuerdo, Supermercados Amigo, Inc., acudió ante este Tribunal mediante una solicitud de certiorari. En su escrito planteó la comisión de dos errores, a saber:
(1) Erró el Honorable Tribunal de Apelaciones al no declarar inconstitucional la Ley 95 de 29 de noviembre de 1992 (Ley 95), por crear esta Ley 95 un esquema de expresión compelida que es inconstitucional de su faz y en su aplicación a la parte demandada en vista de que la Ley 95 viola los preceptos de libertad de expresión y de asociación de la parte demandada garantizados por la Constitución del ELA y por la Primera Enmienda de la Constitución de los EEUU.
(2) Erró el Honorable Tribunal de Apelaciones al permitir que el TPI introdujera y le diera credibilidad a extractos de una deposición (a) tomada por la parte demandante en un caso distinto al de autos [;] (b) de un individuo que no fue testigo en el caso de autos; (c) que la parte apelante no tuvo la oportuni *476 dad de contr[ai]nterrogar[,] y (d) que está plagada de prueba de referencia múltiple que sería inadmisible aún el caso de autos. Petición de certiorari, pág. 3.
El pasado 26 de enero de 2006 expedimos el auto solicitado. Ambas partes han comparecido. En el día de hoy se confirma la determinación del Tribunal de Apelaciones por estar igualmente dividido este Tribunal. Disiento de ese curso de acción porque el esquema establecido en la Ley Núm. 95 viola el derecho de la libre expresión de la peticionaria.
II
Nos toca resolver si el esquema establecido en la Ley Núm. 95 violaba el derecho a la libre expresión de la parte peticionaria o si por el contrario, como aduce el Procurador General en su escrito ante este Tribunal, el mismo constituye un ejercicio válido del Estado inmune a un ataque bajo el derecho a la libertad de expresión. Todo ello en el contexto procesal de una petición de sentencia sumaria.
Comenzamos nuestra discusión con una descripción del diseño establecido por la Ley Núm. 95, para luego abordar la controversia de libertad de expresión que se nos ha planteado.
A. Como ya apuntamos, la Ley Núm. 95 estableció la Oficina de Reglamentación y Promoción de la Industria de la Carne de Res (Oficina). Del texto de la ley se desprende que la intención de la Asamblea Legislativa al aprobar la ley fue propiciar el desarrollo y fortalecimiento de la industria de la carne de res a través de distintos programas, servicios y actividades. Arts. 4 y 6 de la Ley Núm. 95, supra, 5 L.P.R.A. secs. 3003 y 3005. Ello, para beneficio tanto de la ciudadanía como de los productores e importadores de carne de res.(2)
*477 Para subsidiar los programas establecidos y hacer efectivos los objetivos de la ley, ésta creó el Fondo para el Fomento de la Industria de la Carne de Res, que se nutría de las aportaciones por diversos conceptos, impuestas tanto a productores locales como a importadores de carne de res.(3) El Art. 9 de la Ley Núm. 95 disponía específicamente que el Fondo sería utilizado “para la promoción de la producción, venta, elaboración y consumo de la carne de res, y toda otra gestión necesaria para el progreso de la industria de la carne de res”. 1992 Leyes de Puerto Rico 621. Este fondo lo administraba una junta administrativa compuesta por el Administrador, dos representantes de los importadores, tres representantes de los productores, uno de los cuales debía representar a los pequeños agricultores, y un representante del interés público, nombrados todos por el Secretario de Agricultura. Arts. 9 y 10 de la Ley Núm. 95.
La ley disponía que el diez por ciento de los fondos recaudados se destinaban a solventar los gastos administrativos y operacionales de la Oficina. El remanente de los recaudos se utilizaría para adelantar los objetivos estable *478 cidos por ley. Véase Art. 4 de la Ley Núm. 95. El Secretario de Hacienda estaba facultado para cobrar la aportación provista en la ley.
Como ya apuntamos, la ley estuvo en vigor íntegramente hasta el 1 de enero de 1997, cuando entró en vigor la Ley Núm. 238, conocida como la “Ley para el Ordenamiento de las Industrias Agropecuarias de Puerto Rico”.
La Ley Núm. 238, por su parte, creó un nuevo ordenamiento administrativo para regentar la industria agropecuaria en Puerto Rico. La legislación creó la Oficina de Ordenamiento de las Industrias Agropecuarias de Puerto Rico, adscrita al Departamento de Agricultura. 5 L.P.R.A. see. 3052. La ley derogó la disposición de la Ley Núm. 95 que ordenaba la aportación de los importadores de carne de res como a los productores locales de carne de res. Esta ley se aprobó “para fortalecer las industrias agropecuarias. [Para que] las empresas que la componen [puedan] suplir las necesidades de los consumidores puertorriqueños, por productos de alta calidad producidos localmente, logrando así un aumento significativo en la contribución de este renglón [en] nuestra economía”. (Enfasis nuestro.) Exposición de Motivos de la Ley Núm. 238, supra, pág. 1307. De lo anterior se desprende claramente que el propósito de la Ley Núm. 238 fue fortalecer y desarrollar la industria de la carne de res del país.
La ley estableció una junta administrativa para cada sector de la industria agropecuaria y cada sector quedó autorizado para establecer un fondo que permitiera promover el desarrollo de la producción y comercialización de sus productos. 5 L.P.R.A. see. 3056.
En lo que respecta a su interacción con la Ley Núm. 95, la Ley Núm. 238 dispuso que el Secretario de Agricultura estaba facultado para “reestructurar, mediante la reglamentación necesaria, la Oficina para la Reglamentación y Promoción de la Industria de la Carne de Res y la Junta del Fondo para el Fomento de la Industria de la Carne de *479 Res. Esta última, una vez reestructurada, pasará a ser la Junta Administrativa de esta industria agrícola, preservando así la continuidad de sus operaciones”. Art. 13 de la Ley Núm. 238, supra, 5 L.RR.A. sec. 3062. El Art. 12 de esta ley, 5 L.RR.A. see. 3061, proveyó expresamente para la transferencia y continuidad de las funciones de la Oficina para la Reglamentación y Promoción de la Carne de Res, quedando adscrita a la Oficina de Ordenamiento de las Industrias Agropecuarias creada en virtud de la nueva ley.
De lo anterior se colige que la Ley Núm. 238 pretendió crear un nuevo esquema administrativo para incentivar la industria agropecuaria del país, aunque dispuso para que los programas y los fondos creados por la anterior Ley Núm. 95 se transfirieran a la nueva estructura administrativa establecida bajo la primera. Más que nada, la Ley Núm. 238 centró su foco de atención en el crecimiento y desarrollo de la industria agropecuaria del país.
III
A. El derecho a la libre expresión, consagrado en el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico, es uno de los valores más preciados que resguarda la Constitución y cobija “la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de los derechos”. 4 Diario de Sesiones de la Convención Constituyente 2564 (1961). Es piedra angular que sostiene nuestro sistema democrático. Facilita “el desarrollo pleno del individuo y estimul[a] el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático”. Velázquez Pagán v. A.M.A., 131 D.P.R. 568, 576 (1992). En su esencia, la libertad de expresión se levanta como barrera de difícil rebaso para aquella *480 acción del Estado que pretenda asfixiar la expresión del ciudadano.
De la misma forma que este axioma prohíbe que el Estado sofoque la expresión ciudadana, así también le impide que obligue al ciudadano a exponer, manifestar o adoptar credos con los que se está en desacuerdo.(4) En Board of Education v. Barnette, 319 U.S. 624 (1943), se resolvió que el Gobierno no podía obligar a estudiantes de la escuela pública a saludar la bandera y recitar el juramento de fidelidad a Estados Unidos por ser ello contrario a la Primera y Decimocuarta Enmienda de la Constitución. Al así hacerlo, apuntó el Tribunal: “If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. ...” Id., pág. 642. Board of Education estableció el estándar contra el cual se iban a medir las controversias sobre expresión compelida.
Más tarde, en Wooley v. Maynard, 430 U.S. 705 (1977), el Tribunal se enfrentó nuevamente a un planteamiento de expresión compelida. Al hacerlo, declaró inconstitucional por ofender la Primera Enmienda, una ley del estado de New Hampshire que tipificaba como delito mutilar el eslogan del estado, Live Free or Die, que aparecía en las tablillas de los automóviles. Al comparar Wooley con Board of Education, el Tribunal expresó: “Compelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate, but the difference is essentially one of degree.” Wooley, pág. 715.
Posteriormente, el principio establecido en Board of Education fue extendido a controversias que involucraban aportaciones obligatorias de miembros disidentes de foros *481 integrados. Esto es lo que se conoce como la “doctrina de subsidio compelido” (compelled subsidy), una subcategoría de la doctrina de expresión compelida. El concepto subsidio compelido entraña un esquema mediante el cual el Estado le requiere al ciudadano que subsidie con su aportación económica un mensaje con el cual está en desacuerdo.(5)
En Abood v. Detroit Board of Education, 431 U.S. 209 (1977), el Tribunal Supremo de Estados Unidos discutió, por primera vez, la doctrina de subsidio compelido. En Abood, un grupo de maestros del sistema de instrucción pública de Detroit objetó que, en virtud de la cláusula de taller agencial (agency shop) del convenio colectivo, éstos estaban obligados —aún sin ser miembros de la unión— a pagar una cuota especial a manera de reembolso por las gestiones efectuadas por la unión como agente negociador de la colectividad. La objeción de los maestros se basó en que se oponían a la negociación colectiva en el sector gubernamental, así como también al uso que la unión le daba a los fondos de la unión. Los maestros sostenían que este diseño violaba su derecho a la libre expresión, pues le obligaba a subsidiar causas y mensajes políticos e ideológicos auspiciados por la unión con los que no estaban de acuerdo.
El Tribunal Supremo resolvió que la cláusula del convenio colectivo que les obligaba a hacer las aportaciones compulsorias a la unión era válida, toda vez que existía un interés de vital importancia para el Estado en propiciar la negociación colectiva. Ahora bien, dispuso que los maestros no podían ser obligados, por mandato de la Primera Enmienda, a sufragar con sus cuotas actividades políticas o ideológicas que no compartían, ya que el mensaje objetado no era pertinente al proceso de negociación colectiva. Específicamente el Tribunal sostuvo:
*482 We do not hold that a union cannot constitutionally spend funds for the expressions of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment. (Enfasis nuestro y escolio omitido.) Abood, págs. 235-236.
AI así resolver, Abood estableció lo que se conoce como el “estándar de pertinencia” (germaneness test) para determinar cuándo un mensaje puede ser subvencionado por una aportación compelida sin ofender la Primera Enmienda. Abood ejemplifica el paradigma que postula que la libertad de contribuir a causas políticas entraña la libertad de no contribuir. Bajo Abood, un esquema de subsidio compelido que haya sido objetado sólo será válido si: (1) se determina que el mensaje es pertinente a los propósitos y objetivos del grupo, y (2) el mensaje difundido no es político o ideológico.
Posteriormente, en Keller v. State Bar of California, 496 U.S. 1, 14-16 (1990), el Tribunal abundó sobre el estándar de pertinencia aludido al invalidar un programa de cuotas mandatorias porque se utilizaban para financiar expresiones de índole políticas o ideológicas, ajenas a los objetivos de la colegiación compulsoria en el estado de California, íd., pág. 14 (“[T]he guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession”).
En Colegio de Abogados de P.R. v. Schneider, 112 D.P.R. 540, 554 (1982), adoptamos el análisis de Abood y resolvimos que aun cuando la colegiación compulsoria era válida constitucionalmente, el Colegio de Abogados no podía utilizar las cuotas —o parte de ellas— para subsidiar alguna expresión o actividad del Colegio de Abogados con la cual un colegiado no estuviese de acuerdo. Concluimos que el derecho a la libertad de expresión contenido en la Consti *483 tución de Puerto Rico protegía el derecho de los disidentes a no subvencionar con sus cuotas una expresión ideológica que estimaban objetable.
Con posterioridad a Schneider no habíamos tenido oportunidad, hasta ahora, para delinear los contornos de nuestra normativa respecto el derecho a la libre expresión en el contexto de subsidio compelido. En vista de ello, parece apropiado que repasemos, a manera de ilustración, la trayectoria subsiguiente de Abood expuesta por el Tribunal Supremo de Estados Unidos.
B. Los principios establecidos en Abood y Keller, han sido posteriormente aplicados por el Tribunal Supremo —con resultados disímiles— a situaciones que implicaban aportaciones económicas obligatorias (checkoffs) promulgadas mediante reglamentación agrícola, para financiar campañas publicitarias genéricas. E.g., United States v. United Foods, Inc., 533 U.S. 405 (2001); Glickman v. Wileman Brothers & Elliot, Inc., 521 U.S. 457 (1997).(6) Véase, además, Comentario, Food Fights in the Courts: The Odd Combination of Agriculture and First Amendment Rights, 43 (Núm. 2) Hous. L. Rev. 415, 416 (2006) (“The compelled subsidy doctrine had been largely unexplored until its recent collision with agriculture”). En vista de la importancia que revisten Glickman y United Foods a la controversia que hoy se nos plantea, analicemos los mismos con detenimiento.
En Glickman, el Tribunal Supremo rechazó una impugnación bajo la Primera Enmienda de la Constitución de Estados Unidos de un programa establecido de acuerdo con el Agricultural Marketing Agreement Act of 1937 (AMAA), *484 7 U.S.C.A. sec. 601 et seq., que requería, entre otras cosas, que agricultores que cosechaban árboles frutales en California financiaran una campaña genérica de publicidad para fomentar su consumo.(7) Esta campaña formaba parte de un amplio entramado legislativo federal cuyo propósito era controlar el mercado colectivizado de productos agrícolas, en este caso melocotones y ciruelas (agricultural commodities), específicamente respecto a la producción y venta del producto, eliminando la libre competencia. En vista de lo cual, el radio de acción disponible para los agricultores en este mercado había sido restringido ya por el Gobierno federal. Ante esta realidad, el Tribunal definió la controversia ante su consideración bajo los términos siguientes: “The legal question that we address is whether being compelled to fund this advertising raises a First Amendment issue for us to resolve, or rather is simply a question of economic policy for Congress and the Executive to resolve.” Glickman, pág. 468.
El Tribunal rechazó que Abood requiriese que se declarara inválida la campaña publicitaria genérica impugnada, por cuanto no se trataba de expresión de carácter político o ideológico como el implicado enAbood.(8) En específico, el Tribunal indicó lo siguiente:
... Abood, and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, Abood merely recognized a First Amendment interest in not being compelled to contribute to an *485 organization whose expressive activities conflict with one’s “freedom of belief’. (Énfasis nuestro.) Glickman, pág. 471.(9)
Por otro lado, dispuso que la campaña publicitaria objetada era meramente un componente más de lo que era una abarcadora legislación relacionada con un mercado colectivizado altamente regulado, además de que la campaña era claramente pertinente (unquestionably germane) al esquema reglamentario. Glickman, pág. 473. Sobre esto se indicó:
The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme. It is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, under the standard appropriate for the review of economic regulation or under the heightened standard appropriate for the review of First Amendment issues. (Énfasis nuestro.) Glickman, pág. 468.
Glickman analizó la controversia planteada desde la perspectiva de que se trataba de una legislación de carácter económico que regulaba intensa y ampliamente el mercado al punto de restringir el libre comercio, proveyendo estabilidad al mercado, y no desde la óptica de la Primera Enmienda y de la obligación impuesta por ley sobre el locutor, quien teniendo objeciones definidas al mensaje estaba obligado a subvencionarlo. Como resultado del anterior análisis se sostuvo la validez del programa impugnado. Véase 2 Smolla and Nimmer on Freedom of Speech Sec. 20:45 (Supl. 2006).
Por otro lado, en United Foods, ante, en un caso con un andamiaje similar al de Glickman, el Tribunal Supremo *486 llegó a la conclusión opuesta. El programa impugnado en United Foods se estableció de acuerdo con la ley federal conocida como Mushroom Promotion, Research and Consumer Information Act, 7 U.S.C.A. sec. 6101 et seq. Bajo esta ley el Secretario de Agricultura estaba autorizado a crear un consejo asesor para adelantar los objetivos del estatuto federal. Como parte de ello se proveyó para imponer una contribución obligatoria a los productores de zetas con el propósito de promover esta industria, promover la investigación y proveer información al consumidor, así como a distintos sectores de la industria. 7 U.S.C.A. see. 6104(g)(2). La mayoría de los fondos recolectados se utilizaron para una campaña genérica de publicidad encaminada a promover la venta de zetas.
El Tribunal concluyó, a base del expediente ante sí, que el único programa financiado por las contribuciones era la campaña publicitaria, es decir, la expresión misma. Se determinó entonces, aplicando a Abood y Keller, que el programa allí impugnado ofendía la Primera Enmienda. “The only program the Government contends the compelled contributions serve is the very advertising scheme in question.” United Foods, supra, pág. 415.
Se precisó que la diferencia fundamental entre el programa rechazado en United Foods y el declarado válido en Glickman era que el establecido en este último formaba parte de un esquema de reglamentación amplio del mercado, en el cual la campaña publicitaria era meramente una parte incidental. Por el contrario, en United Foods no existía tal esquema de regulación sino todo lo contrario, pues regía un mercado de libre competencia. United Foods, supra, pág. 411. En específico, el Tribunal indicó lo siguiente:
In contrast to the program upheld in Glickman, where the Government argued the compelled contributions for advertising were “part of a far broader regulatory system that does not principally concern speech,” ... there is no broader regulatory system in place here. We have not upheld compelled sub *487 sidies for speech in the context of a program where the principal object is speech itself. ... The cooperative marketing structure relied upon by a majority of the Court in Glickman to sustain an ancillary assessment finds no corollary here; the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of Abood extended to the party who objects to the compelled support for this speech. (Enfasis nuestro.) United Foods, págs. 415-416.(10)
Es importante destacar, que al aplicar Abood, el Tribunal expandió la protección que ofrece la Primera Enmienda al resolver que la expresión objetada no tenía que ser de carácter político o ideológico para estar protegida, como se había dispuesto en Glickman.(11) Por lo tanto, la única pregunta que había que hacerse era si la aportación económica compelida era pertinente para adelantar el fin legítimo del Estado en el programa legislado. La pregunta se contestó en la negativa al determinarse que el único propósito de la aportación resultaba ser la expresión misma.
Finalmente, hay que puntualizar que en la opinión el Tribunal intimó que el mismo esquema podría resistir un ataque bajo la Primera Enmienda si la campaña publicitaria pudiese ser catalogada como expresión gubernamental.(12) United Foods, págs. 416-417. Un año más tarde, esa controversia llegó al Tribunal en Johanns v. Livestock Marketing Assn., ante.
*488 IV
En Johanns, ante, se cuestionaba también un programa de subsidio competido muy similar al declarado inválido en United Foods; en esta ocasión el producto agrícola era la carne de res. El Tribunal validó la aportación compelida al concluir que la campaña publicitaria objetada constituía expresión gubernamental legítima no sujeta a las limitaciones de la Primera Enmienda.(13) El Tribunal sostuvo que el mensaje promocional en ese caso estaba controlado férreamente en todas sus etapas por el Gobierno federal. “The message set out in the beef promotions is from beginning to end the message established by the Federal Government.” Johanns, págs. 560-561. Siendo entonces expresión gubernamental, el gobierno podía solicitar la asistencia de fuentes no gubernamentales para costear el programa, como eran los productores de carne. Sobre este particular se indicó en la opinión:
When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages. Johanns, pág. 562.
El Tribunal sostuvo también que el hecho que los fondos procedieran de una aportación específica o dirigida a un grupo en particular, y no de un impuesto general, no va *489 riaba el resultado. A ésos efectos, indicó el Tribunal: “The compelled-subsidy analysis is altogether unaffected by whether the funds for promotions are raised by general taxes or through a targeted assessment. Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech.” (Enfasis suprimido.) Johanns, pág. 562.
Como resultado de lo anterior, el Tribunal concluyó que cuando se trate de una expresión gubernamental legítima, la impugnación de su faz del mecanismo de susidio compelido establecido, como ocurrió en Johanns, es improcedente como cuestión de derecho. El Tribunal rehusó extender su pronunciamiento a situaciones que involucrasen una impugnación, en su aplicación, de un esquema de subsidio compelido.
La casuística que hasta aquí hemos reseñado pone de manifiesto cómo el Tribunal Supremo de Estados Unidos ha atendido el tema del subsidio compelido y su interrelación con el derecho a la libre expresión consagrado en la Primera Enmienda de la Constitución federal. Nos corresponde a nosotros evaluar, con independencia de dicha jurisprudencia, una controversia idéntica bajo el crisol de la Constitución del Estado Libre Asociado.
V
A. Apuntamos inicialmente que el peticionario argüía que el programa establecido mediante la Ley Núm. 95 era inconstitucional, tanto de su faz como en su aplicación, por violar su derecho a la libertad de expresión al obligarlo a contribuir económicamente a una campaña de publicidad encaminada a promocionar la carne de res del país, en perjuicio de sus intereses económicos como importador de carne. El Estado, por su parte, refutó tal planteamiento a base de dos argumentos principales. Primero, que se trataba de expresión gubernamental no sujeta a los rigores *490 del derecho a la libertad de expresión. Segundo, que la aportación impugnada se utilizaba para subvencionar un mensaje genérico válido que formaba parte del amplio esquema reglamentario que regula la industria de la carne de res.
B. Atendemos primeramente el argumento del Estado de que el mensaje objetado es expresión gubernamental, pues de asistirle la razón ahí concluiría nuestra revisión de esta controversia. Ciertamente, ésta es la pregunta medular en este caso.
Iniciamos señalando que éste es un tema que no habíamos abordado previamente; aunque sí habíamos expresado que el gobierno está facultado y tiene el deber de informar a la ciudadanía sobre asuntos de vital interés para ésta, propios a la gestión gubernamental. A modo de ejemplo, no cabe cuestionar la validez de un programa gubernamental encaminado a informar y orientar al país sobre cómo afrontar un desastre natural o una epidemia.
En P.P.D. v. Gobernador I, 139 D.P.R. 643, 680 (1995), indicamos lo siguiente: “Hemos reconocido que la expresión del Gobierno de naturaleza educativa e informativa es indispensable para que el pueblo pueda juzgar su labor y exigir remedios a los agravios gubernamentales.” (Énfasis nuestro.) Como vemos, al reconocer la facultad del Gobierno de expresarse lo hicimos en función de que de esta forma se propiciaba la labor fiscalizadora del ciudadano sobre la gestión misma del Gobierno. P.P.D. v. Gobernador I, ante; Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 381 (1984). Hemos sido en extremo celosos al evaluar controversias relacionadas con el derecho del Gobierno a exponer un mensaje al punto de rechazar, sin ambages, reclamos de éste de que le asiste un derecho constitucional a expresarse para informar al ciudadano sobre su gestión. P.P.D. v. Gobernador II, 136 D.P.R. 916, 923 (1994) (“el Gobierno no tiene un derecho constitucional a la libre expresión protegido”). Véase, también, P.P.D. v. Gobernador I, *491 ante. Es, por lo tanto, en este contexto y con este trasfondo que debemos encarar la interrogante que se ha planteado sobre si estamos concretamente frente a una expresión gubernamental.(14)
C. La doctrina de expresión gubernamental tiene que partir de la premisa que es una realidad indiscutible que para gobernar hay que comunicar. Hay que informarle a la ciudadanía todo aquello que resulte indispensable y pertinente a la gestión misma de gobierno. El Gobierno tiene entonces que, necesariamente, acudir y participar en el “mercado de las ideas”.(15) Otro de sus supuestos tiene que ser el reconocimiento de que el proceso político constituye el detente más importante a los excesos del Gobierno. Éste, el proceso político, se convierte entonces en el garante del derecho a la libre expresión de quienes objetan un mensaje compelido.(16)
Por ello, somos del criterio que para que el proceso político surta efecto y el ciudadano fiscalice eficazmente al Gobierno en este contexto, es indispensable que el ciudadano pueda identificar que la expresión objetada proviene del *492 Estado. Salvo que sea evidente que el mensaje putativo gubernamental proviene efectivamente del Gobierno, la proveniencia gubernamental no puede justificar la carga sobre el derecho a la libre expresión que supone un mensaje compelido. Tiene que ser así, pues la premisa es sencilla: sin conocimiento de los hechos, “no se puede juzgar; tampoco se pueden exigir remedios a los agravios gubernamentales ... a través del proceso de las urnas cada cuatro (4) años”. Soto v. Srio. de Justicia, 112 D.P.R. 477, 485 (1982). Véase, también, Santiago v. Bobby El Mundo, Inc., 117 D.P.R. 153, 159 (1986). Recordemos lo que ya hemos resuelto: la expresión gubernamental se da en función del derecho del ciudadano a fiscalizar la gestión gubernamental. P.P.D. v. Gobernador I, ante.
En este caso, el mensaje objetado no aparecía identificado como un mensaje del Gobierno. Conforme se desprende de los anuncios en prensa, cuyas copias obran en autos, lo único que identificaba al locutor era, en dos de ellos, el logo del Fondo del Fomento de la Carne de Res y el eslogan “Carne Fresca del País”.(17) En los otros anuncios de prensa, la única atribución que aparece es solamente el eslogan “Carne Fresca del País”, sin más. Este mismo eslogan aparece en pegatinas y camisetas. De otra parte, del texto de los anuncios que se difundieron en la radio no surge que se identificara al Gobierno como el locutor. Véase Apéndice de la Petición de certiorari, págs. 112—152. Bajo ninguno de estos supuestos, como se puede apreciar, el ciudadano podía identificar al Estado como el comunicador. El Estado no nos ha indicado que se publicaran otros anuncios donde se identificara al Estado como el emisor; y de ninguna manera ha refutado la aseveración *493 del peticionario sobre este particular. Siendo ello así, no podemos brindarle al mensaje difundido el manto de protección que le cobijaría bajo la doctrina de expresión gubernamental. No tiene razón el Estado en su planteamiento.
D. El segundo señalamiento del Estado es que la campaña objetada era válida toda vez que, al igual que ocurría en Glickman, en este caso nos enfrentamos a una industria altamente regulada. Señaló el Procurador General: “Un examen de la legislación y reglamentación aplicable a la industria de la carne de res demuestra que éste es un producto altamente regulado, tanto en la actividad de exportación, como de importación.” Alegato del Procurador General, pág. 29. A modo de ejemplo, el Estado enumeró los requisitos federales impuestos al mercado de la carne, con los cuales el gobierno del Estado Libre Asociado tiene que cumplir. E.g., inspección y examen de la carne (21 U.S.C.A. sees. 603, 606, 608 y 609); disposición de excedente o desechos (21 U.S.C.A. sees. 604 y 605); etiqueta y empaque (21 U.S.C.A. see. 607); almacenaje (21 U.S.C.A. see. 624).
Lo cierto es que soy del criterio que no debemos descartar la posibilidad de que proceda incorporar la norma de Glickman a nuestra Constitución. Cuando el esquema reglamentario sea tan extensivo como el que allí se evaluó, podría entenderse que el carácter gubernamental de la ex-presión compelida ha de ser evidente para los ciudadanos. Ahora bien, podemos evaluar el planteamiento del Estado sin resolver hasta qué punto (si alguno) la doctrina Glickman debe incorporarse a nuestra Constitución.
El problema con el argumento del Estado es que confunde el contenido del concepto de “regulación del mercado” esbozado en Glickman. Glickman se refiere a aquella reglamentación que rige en un mercado colectivizado, dirigida a controlar los precios en el mercado desplazando la libre competencia. Recordemos que el Agricultural Marketing Agreement Act of1937 (AMAA), analizado en el caso, es *494 una legislación aprobada como parte del Nuevo Trato. Sobre el AMAA, Glickman indica lo siguiente, y citamos in extenso:
Congress enacted the Agricultural Marketing Agreement Act of 1937 (AMAA), ... in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. ... Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets; they are expressly exempted from the antitrust laws. ... Collective action, rather than the aggregate consequences of independent competitive choices, characterizes these regulated markets. In order “to avoid unreasonable fluctuations in supplies and prices,” ... these orders may include mechanisms that provide a uniform price to all producers in a particular market, that limit the quality and the quantity of the commodity that may be marketed, ... that determine the grade and size of the commodity, ... and that make an orderly disposition of any surplus that might depress market prices .... (Énfasis nuestro y escolio omitido.) Glickman, pág. 461.
Es por ello que el Tribunal evaluó la controversia desde la perspectiva que analizaba una legislación de carácter económico aprobada por el Congreso, que le merecía gran deferencia. “In sum, what we are reviewing is a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress.” Glickman, pág. 477. Es importante puntualizar que la reglamentación en Glickman estaba exenta de las leyes de monopolios pues, en efecto, lo que hacía era controlar férreamente el mercado de la demanda para así controlar los precios.
En este caso el Estado no ha planteado que la Ley Núm. 95 y su reglamentación tuviesen como objetivo regular el mercado de la carne en el país para controlar así su precio. Por el contrario, el mercado de la carne de res en Puerto Rico —contrario a lo que sucede con nuestra industria lechera o la del café—, no impone precios uniformes, no impone cuotas respecto a la cantidad que se produce y mer *495 cadea, no admite restricciones en cuanto a calidad y no impone un procedimiento sobre cómo se utilizarán las ganancias obtenidas. Véase Alegato de la parte peticionaria, págs. 22-23. Además, éste no es un mercado que se ha colectivizado o que se eximió de las leyes monopolísticas, como tampoco ha sido subsidiado por el Gobierno mediante apoyo en cuanto a precios. En conclusión, contrario a lo que ocurría en Glickman, en el mercado de carne de res en Puerto Rico rige la libre competencia.
Glickman, por lo tanto, no está disponible para validar el esquema de subsidio compelido establecido por la Ley Núm. 95.
E. Debemos preguntarnos entonces si bajo la Constitución del Estado Libre Asociado, la utilización que se le ha dado a las aportaciones establecidas bajo la Ley Núm. 95 infringe el derecho a la libre expresión de la parte peticionaria. Somos del criterio que, a la luz de los hechos en este caso, la respuesta es en la afirmativa.
Los fondos provenientes de las aportaciones que nutrían el Fondo se debían utilizar, entre otras cosas, para diseñar una campaña publicitaria genérica a favor del consumo de la carne en Puerto Rico. Ahora bien, ello no ocurrió así. Los objetivos de esta campaña, según diseñados por la agencia que la desarrolló, fueron los siguientes: “(1) Crear conciencia de que existe una alternativa real en la carne de res de PR. (2) Fomentar el consumo de carne de res de PR. (3) Crear reconocimiento del nombre. (4) Demostrar frescura y calidad del producto.” (Énfasis nuestro.) Apéndice de la Petición de certiorari, pág. 120. Parece evidente que el propósito de la campaña diseñada era, efectivamente, resaltar y así promover el consumo de la carne de res del país.
De hecho, el comunicado de prensa difundido informando sobre el lanzamiento de la campaña publicitaria indicaba lo siguiente: “La Industria de la Carne de Res del País comenzó una nueva campaña de publicidad para pro-mover su consumo en Puerto Rico. [La campaña] consta de *496 anuncios de prensa y radio que resaltan los atributos de frescura y calidad que contiene la Carne de Res del País .... [E]l concepto de frescura [se estableció] como elemento principal de la campaña.” (Énfasis nuestro.) Apéndice de la Petición de certiorari, pág. 162. Lo primero que llama la atención del referido comunicado de prensa es que se informa que el auspiciador de la campaña es la industria de la carne de res del país. Luego resulta evidente que el enfoque de la campaña es precisamente resaltar esta industria. Así se desprende de los anuncios publicados. Veamos algunos ejemplos.
Los anuncios que constan en autos. Veamos algunos ejemplos:
Uno de los anuncios en cuestión, publicado a página completa en uno de los diarios del país, leía como sigue:
Cuando se tiene un buen producto hay que resaltar todos sus méritos. Frescura, Sabor, Calidad.
La Carne de Res del País es carne Magra[,] limpia, baja en grasa y con los minerales necesarios para el desarrollo. Además, contiene proteínas, hierro y vitaminas ....
Nuestro compromiso con Puerto Rico va más allá de cumplir con una labor. Queremos darle lo mejor de nuestra tierra. Por eso cada empaque de Carne de Res lleva una etiqueta ... que indica su lugar de procedencia. Busca que sea del País. Estamos tan seguro de la calidad de nuestro producto que indicamos en la etiqueta que es de aquí. (Énfasis nuestro.)
Otro de los anuncios objetados incluía la siguiente ex-hortación al ciudadano: "... cuando compre carne de res ... pídala con todo. Con todo el cuidado y esfuerzo con que se crían las reses en Puerto Rico ... con todo el amor que se le dedica al trabajo ... además de todo el sabor, la frescura, la calidad y los componentes nutricionales que tiene la Carne de Res del País” (Énfasis nuestro.) Apéndice de la Petición de certiorari, pág. 113.
De otra parte, todos los anuncios que se publicaron llevaban estampado el eslogan “Carne Fresca del País”. Ex-presión que entraña un mensaje subliminal de que lo fresco, que es lo producido localmente, es superior a lo *497 importado. Ya vimos cómo el concepto “frescura” se incorporó expresamente a esta campaña. Aun cuando uno de los propósitos del Fondo creado en virtud de la Ley Núm. 95 era promocionar la industria de la carne de res en Puerto Rico, según el plan diseñado, aprobado e implementado, la campaña genérica desarrollada sólo beneficiaba la industria de carne de res del país y no la carne importada. Por el contrario, la campaña perjudicaba el mercado de la carne de res importada. Se le requería a la parte peticionaria financiar una campaña de publicidad que sólo beneficiaba a su competencia. Para contrarrestar el posible efecto negativo del mensaje genérico, Amigo estaría obligado a desarrollar una “contra campaña” resaltando los beneficios de la carne de res importada. No se ha aducido razón alguna que permita validar la carga impuesta sobre el derecho a la libre expresión de la parte objetante al mensaje compelido.(18)
En este caso nos enfrentamos a una campaña publicitaria genérica a favor del consumo de un producto en perjuicio de otro, campaña subvencionada por aportaciones obligatorias del ente “peijudicado” por el contenido mismo de la campaña.(19) El Gobierno no puede con su acción —sin ofender el derecho a la libre expresión— inclinar la balanza a favor de un sector de una industria en perjuicio del competidor, de la forma y manera que ha ocurrido en este caso. Los valores que representan el derecho a la libertad de expresión se ven amenazados cuando el Gobierno obliga *498 a sus ciudadanos, o a un grupo en particular, a subvencionar un mensaje que éste favorece. En consecuencia, el subsidio compelido establecido por la Ley Núm. 95, según diseñado e implantado, violaba el derecho a la libre expresión de los peticionarios, según establecido en el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico.

 Del estado de situación del Fondo para el Fomento de la Industria de la Carne de Res (Fondo) que se anejó a la moción de sentencia sumaria, se desprende que el estimado de aportaciones que debían ingresar al Fondo, calculado a partir de la fecha en que entró en vigencia al 30 de noviembre de 1995, era de $2,631,361.73. De esa cantidad, sólo se había recolectado $650,189.04 al 30 de noviembre.

 Los propósitos de la Ley Núm, 95 de 29 de noviembre de 1992 quedaron plasmados en su Exposición de Motivos, que dispone lo siguiente:
“Siendo la carne de res alimento básico de alto valor alimenticio en la dieta *477 humana, es nuestro deber dirigir todos los esfuerzos que sean necesarios para lograr el fortalecimiento y desarrollo que requiere esta empresa. Se caracteriza la misma al presente, por una desorganización la cual es visible a diferentes niveles. Reflejo de lo antes indicado es lo siguiente: la carencia de oficinas centralizadas en la cual se pueda tener accesible información sobre precios y condiciones de venta de la carne de res; ausencia de centros de datos sobre diversos aspectos de la industria; falta de orientación y promoción consistente y permanente así como falta de centros de investigación relacionados con la industria de la carne de res.
“La permanencia así como la expansión de mercados existentes para la carne de res son de vital importancia para el bienestar de los productores, importadores y otros relacionados con este mercado tan importante para la economía de la Isla. De igual manera es importante que la carne de res sea accesible en un mercado eficiente de manera que podamos asegurar una mejor nutrición a nuestro pueblo.” 1992 Leyes de Puerto Rico 615.

 El Art. 9 de la Ley Núm. 95 de 29 de noviembre de 1992 disponía de las siguientes aportaciones para nutrir el fondo: “(1) Cuatro dólares con catorce centavos ($4.14) por cada animal sacrificado en matadero tomando como base el peso promedio de un animal sacrificado en matadero. (2) Un centavo (Id) por libra de carne [de] res importada tomando como base el pago hecho para el producto local en consideración al rendimiento del animal sacrificado por el productor local. (3) Un dólar ($1) por cada ternero sacrificado en matadero.” 1992 Leyes de Puerto Rico 615, 622.

 Esto se denomina en la doctrina norteamericana como “expresión compelida” (icompelled speech).

 Johanns v. Livestock Marketing Assn., 544 U.S. 550, 557 (2005) (“[In] ‘compelled-subsidy’ cases ... an individual is required by the government to subsidize a message he disagrees with ...”).

 Cabe señalar que por campaña publicitaria genérica se entiende aquella campaña diseñada a estimular el consumo de un producto agrícola en un mercado. Glickman v. Wileman Brothers & Elliot, Inc., 521 U.S. 457, 476 (1997) (“Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market. That purpose is legitimate and consistent with the regulatory goals of the overall statutory scheme”).

 El Agricultural Marketing Agreement Act of1937 (7 U.S.C.A. sec. 601 et seq.), fue uno de los programas legislados por el Congreso de Estados Unidos como parte del programa del Nuevo Trato del Presidente Roosevelt.

 Ciertamente, el derecho a la libre expresión que se reconoce en la Constitución del Estado Libre Asociado tiene un contenido más amplio que lo expresado por el Tribunal en Glickman con su restrictiva interpretación del contenido y alcance de Abood. E.g., Roth v. United States, 354 U.S. 476, 484 (1957) (“All ideas having even the slightest redeeming social importance ... have the full protection [of the First Amendment]”).

 Este razonamiento fue vehementemente rechazado en la opinión disidente, así como por tratadistas que han abordado el tema. Véase 2 Smolla and Nimmer on Freedom of Speech Sec. 20:45, pág. 20-156 (Supl. 2006) (“The Court seemed to analyze the case with blinders on, seeing it as posing only questions of agricultural policy, not control of expression”).

 Véase Dindinger, Free Speech for Mushrooms but not Peaches: Economic Regulations after United Foods, Inc, 31 Colo. Law 61, 63 (2002).

 En United States v. United Foods, Inc., 533 U.S. 405, 413 (2001), el Tribunal Supremo indicó:
“We did say in Glickman that Abood ‘recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflicts with one’s ‘freedom of belief’.... We take further instruction, however, from Abood’s statement that speech need not be characterized as political before it receives First Amendment protection. A proper application of Abood requires us to invalidate the instant statutory scheme.” (Énfasis nuestro y citas omitidas.)

 El Tribunal Supremo no tuvo que enfrentarse a un planteamiento de esta naturaleza en United Foods, ante, porque el asunto no fue expuesto ante los foros inferiores y, por lo tanto, el Tribunal rehusó entrar a evaluarlo cuando el Gobierno federal lo planteó por primera vez ante el Tribunal Supremo.

 Para muchos, la trilogía de Glickman, United Foods y Johanns, ejemplifica el estado de fluidez de la doctrina de expresión gubernamental y la ausencia de un andamiaje conceptual claro y preciso que permita aplicarla en casos que involucran una contribución compelida. E.g., Comentario, Uncovering Coherent in Compelled Subsidy of Speech doctrine: Johanns v. Livestoxck Marketing Ass’n, 125 S.Ct. 2055 (2005), 29 Harv. J.L. & Pub. Pol’y 1107, 1112 (2005) (“the Court’s decision in three mandatory checkoff cases over eight years seem more schizophrenic that schematic”); Comentario, Government Speech Doctrine, Compelled Support for Agricultural Advertising, 119 Harv. L. Rev. 277, 283 (2005) (“In the wake of Johanns, it is clear that government speech doctrine can trump other First Amendment concerns”, escolio omitido); D.E. Troy, Do We Have a Beef with the Court? Compelled Commercial Speech Upheld, But it Could Have Been Worse, 2005 Cato Sup. Ct. Rev. 125.

 Debemos puntualizar aquí que la doctrina de expresión gubernamental es de reciente creación en Estados Unidos, donde ha generado una enorme controversia. Su desarrollo, por lo tanto, se encuentra en etapa incipiente, por lo que los contornos de la doctrina no han sido delineados con total precisión. Sobre este tema, véanse, entre otros: Nota, The Curious Relationship Between the Compelled Speech and Government Speech Doctrines, 117 (Núm. 7) Harv. L. Rev. 2411, 2427 (2004) (“[Government speech is] the ugly stepchild of First Amendment doctrine”); Comentario, Food, Fights in the Courts: The Odd Combination of Agriculture an First Amendment, 43 (Núm. 2) Hous. L. Rev. 415, 446 (2006) (“Rather than any one solid principle, a conglomeration of disparate rulings have been patched together to form a doctrine of sorts”); R.P. Bezanson y W.G. Buss, The Many Faces of Government Speech, 86 (Núm. 5) Iowa L. Rev. 1377, 1381 (2001) (“[The Supreme Court has built] an edifice now so riven with incoherence and fine distinctions that it is on the verge of collapse”).

 Cf. Abrams v. United States, 250 U.S. 616, 630 (1919) (“[T]he ultimate good desired is better reached by free trade in ideas — th[e] ... best test of truth is the power of the thought to get itself accepted in the competition of the market ...”).

 Sobre este particular se indicó en Johanns, pág. 575 (opinión disidente del Juez Souter): “Democracy ... ensures that government is not untouchable when its speech rubs against the First Amendment interest of those who object to supporting it; if enough voters disagree with what government says, the next election will cancel the message.”

 La plataforma estratégica diseñada por la compañía publicitaria contratada por el Fondo, señalaba que en estos anuncios aparecería el logo del Departamento de Agricultura, del Fondo del Fomento de la Industria de la Carne de Res y el eslogan de Carne de Res del País. Como indicamos, en la copia de los anuncios que se anejaron a la moción de sentencia sumaria no aparece el logo del Departamento y sólo el del Fondo.

 No nos expresamos, por lo tanto, sobre qué diferencia, si alguna, pudiera tener sobre el resultado el que la campaña estuviese dirigida a evitar una situación grave de salud pública como, por ejemplo, que la carne importada estuviese afectada por la enfermedad de encefalopatía espongiforme bovina, comúnmente conocida como el mal de ‘las vacas locas”. Nuestra expresión en esta ocasión se circunscribe a los hechos específicos en este caso.

 A luz del resultado a que llegamos hoy, es innecesario que discutamos qué otro tipo de actividad se subvencionaba con el Fondo, pues independientemente de lo anterior, es evidente que la campaña que se diseñó violaba el derecho a la libre expresión del peticionario. Se hace innecesario entonces discutir el segundo señalamiento de error que nos fuera presentado.